FILED
JAMES BONINI
CLERK

04 JUL 20 PM 3: 45

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RONDA A. METTEY, | ) | CASE NO. C-1-02 398 |
| | ) | |
| Plaintiff, | ) | JUDGE SPIEGEL |
| | ) | |
| v. | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| AMERICAN FAMILY MUTUAL | ) | |
| INSURANCE CO., et al., | ) | |
| | ) | |
| Defendants. | | |

Now come Defendants, by their undersigned counsel, and hereby move this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an entry of summary judgment in their favor on all of the Plaintiff's claims. The grounds which support the present Motion are set forth in Defendants' Memorandum in Support of Motion for Summary Judgment being filed simultaneously herewith.

Respectfully submitted,

_Geraldine M. Johnson_
Geraldine M. Johnson (0010450)
ROETZEL & ANDRESS
310 Chiquita Center
250 East Fifth Street
Cincinnati, Ohio 43202
(513) 361-8288
(513) 361-0335 FAX
gjohnson@ralaw.com

ATTORNEY FOR DEFENDANTS

**MEMORANDUM IN SUPPORT**

I.    **STATEMENT OF FACTS AND PROCEDURE**

In 1997, Plaintiff Ronda Mettey was searching for a new business opportunity and heard

from a friend about the opportunities available at American Family Life Insurance Company

("American Family").[1]  (Mettey Depo., at 4, attached as Exhibit "A").   That friend told her that

American Family was expanding its business to the Cincinnati area.[2]  (Mettey Depo., at 48).  Her

interest piqued, Plaintiff decided to speak with American Family to see what it was offering in

terms of opportunities with the Company.  (Mettey Depo., at 49).

To that end, she attended a job fair at which American Family had a booth. While there,

she gave her resume to Kendall Toureene, a district manager for American Family.  (Mettey

Depo., at 49).  She told him that she would be interested in learning more about opportunities at

the Company.  She and Mr. Toureene subsequently spoke on the phone several times.  (Mettey

Depo., at 50).   In late 1997 or early 1998, Plaintiff and Mr. Toureene met at American Family's

newly acquired offices in Mason, Ohio.  (Mettey Depo., at 51).  At the time of the meeting,

Plaintiff knew that American Family hired agents to operate agencies and sell its insurance

products, and was hoping that Mr. Toureene would extend an offer to her to do so.  (Mettey

Depo., at 53).  Plaintiff assumed that as an independent agent she would be running her own

business were she to sign on as an American Family agent.  (Mettey Depo., at 55).  Specifically,

she assumed she would be making decisions on how to operate the business, doing so by her own

efforts.  (Mettey Depo., at 55).  Similarly, Mr. Toureene told her that this was indeed the case,

that she would be running her own business.  (Mettey Depo., at 56).

---

[1] Defendants will be collectively referred to as "American Family."
[2] Plaintiff subsequently worked in the American Family district of Ohio South, which encompassed the Cincinnati and Dayton areas.  (Deposition of Kendall Toureene, hereinafter "Toureene Depo.," at 7).  Ohio South was part of American Family's Valley Region.  (Toureene Depo., at 7).

Prior to her actual appointment as an agent, Plaintiff had probably twenty to thirty conversations with Mr. Toureene and others at American Family. (Mettey Depo., at 57). She received American Family's "new recruit video" as well as literature on the Company and its "Advanced Compensation Program" ("ACP"). Mr. Toureene told her about the background and strength of the Company – it was expanding to new states, had been in business for seventy years, held most of the insurance market share in Wisconsin, and had many long-term agents. (Mettey Depo., at 61-62).

Of particular interest to Plaintiff was the ACP, whereby American Family would advance up to $30,000 per year to new agents to begin their business. (Mettey Depo., at 67). That ACP amount would remain in place to offset the expenses of starting her agency until the agency became self-sufficient and the funds were no longer needed. (Mettey Depo., at 67, 68; Toureene Depo., at 19, attached as Exhibit "B"). Self-sufficiency would be established once renewal premiums from Plaintiff's agency met or exceeded the dollar amount for which it was budgeted, which would equal or exceed the ACP amount. (Mettey Depo., at 69; Toureene Depo., at 30-31). Plaintiff learned about ACP from American Family's publications and from her discussions with Mr. Toureene. (Mettey Depo., at 67). Plaintiff and American Family did not discuss a specific dollar amount until Plaintiff made the commitment to get started. At that time, Plaintiff received $2,500.00 per month under the ACP plan, although it was subsequently increased to $3,000.00 per month. (Toureene Depo., at 20, 24). These amounts were based on a budget upon which both Plaintiff and her manager agreed. Id.

Plaintiff passed Ohio's insurance licensing test in April 1998 and American Family appointed her to agency on May 15, 1998. (Mettey Depo., at 57). Plaintiff began operating what was known as a "scratch" agency, that is, an agency without policy holders. (Toureene Depo., at

3

25).  Both the State of Ohio and the district in which Plaintiff set up her agency were known as a "scratch state" and a "scratch district" because American Family had no existing policyholders or agents there.  (Mettey Depo., at 88).   As an American Family agent, Plaintiff entered into an independent contractor agreement ("the Agreement", Exhibit 6 to Mettey's Deposition, and attached as Exhibit "C" to this Motion) with the Company.  (Mettey Depo., at 211-12; Mettey Exhibit 6).  Importantly, the Agreement provided:

> It is mutually agreed that:
>
> It is the intent of the parties hereto that you are not an employee of the Company for any purposes, but are an independent contractor for all purposes, including federal taxation with full control of your activities and the right to exercise independent judgment as to time, place and manner of soliciting insurance, servicing policyholders and otherwise carrying out the provisions of this agreement.  As an independent contractor you are responsible for your self-employment taxes and are not eligible for various employee benefits such as Workers and Unemployment Compensation.

(Agreement, Section 6.a).

Plaintiff's obligations included maintaining her business and acting as a fiduciary for American Family funds.  (Mettey Depo., at 233).  She admits part of her responsibilities as an agent was to create production of new business – i.e., sell insurance products.  (Mettey Depo., at 234, 236).  Kendall Toureene was Plaintiff's district manager at the time of her hire.  (Mettey Depo., at 10).  Cassandra Stiff, American Family's Sales Director, supervised Mr. Toureene and the other district managers (who were employees of the company).  (Deposition of Cassandra Stiff, hereinafter "Stiff Depo.," at 8, attached as Exhibit "D").

Plaintiff set her agency budget herself, deciding which amounts she would need for overhead, salaries, and similar operating expenses, and predicting how much income she would have.  Her initial ACP amount was $2,500 per month and it was within her discretion how she would spend those funds.  She could use them for her living expenses as well as for the expenses

4

of setting up her agency for the sale of American Family products. (Mettey Depo., at 70, 71). After calculating these expenses and receiving the budget, Plaintiff accepted the budget in writing via her signature and received a copy of it. (Mettey Depo., at 71).

American Family contracted with Plaintiff to sell its insurance products. To that end and in conjunction with its ACP benefits to its agents, American Family expected a certain the production level of Plaintiff and all of its agents. (Mettey Depo., at 87). The manner/methods employed by Plaintiff to achieve such a level was largely up to her. Plaintiff, for instance, planned to obtain sales from those she knew because she had lived in the Cincinnati area for twenty years. (Mettey Depo., at 93). Almost immediately Plaintiff began to complain about production levels expected of her, testifying at deposition that it was unreasonable due to her lack of experience and the preparation time required to sell a product. (Mettey Depo., at 89). During the time that Mr. Toureene managed Plaintiff, her production was spotty. Therefore, he worked with her to increase it. (Toureene Depo., at 36).

As an insurance agent licensed by the State of Ohio, the Ohio Department of Insurance required her to keep certain records. (Mettey Depo., at 92). It was preferred that she have an office so that clients would have a physical place to meet with her.[3] American Family, cognizant of the fact that Plaintiff would be selling its products in a state which heavily regulates the insurance industry, provided her training on its products, and provided her with forms and sales literature to help in her sales endeavors. (Mettey Depo., at 99 et seq., 102). In addition, American Family required adherence to ethics and business standards, again cognizant of the fact that these agents would be selling its products and maintaining its reputation. For instance,

---

[3] For the four months prior to obtaining agency, Plaintiff worked out of American Family's newly obtained regional offices in Mason, Ohio, at which phone calls intended for her could be transferred. (Mettey Depo., at 95). This was not any type of gratuitous benefit to her, but a business expense, and American Family deducted the phone and cubicle expenses from her advance. (Mettey Depo., at 95-96).

Plaintiff was required to maintain two bank accounts, one for money received from clients and one for the advance money received from American Family. (Mettey Depo., at 105).

American Family, in its experience as a successful insurance company, encouraged networking for its new agents and Plaintiff found that such a technique was successful for her. (Mettey Depo., at 127). Indeed, at the beginning, she claims to have had more business than she could handle. (Mettey Depo., at 127). At the outset, Plaintiff testified that she had no production requirement, but that as the region grew over the next eight months, production levels were set. (Mettey Depo., at 122-23).

Plaintiff found fault with many aspects of her business, including the quality of agent meetings and what she perceived as "micro-managing" by Cassandra Stiff, the State Director. (Mettey Depo., at 130, 132). However, when pointedly asked, Plaintiff conceded that, although she disagreed with the way in which things were done, she did not disagree with the production expectations that American Family had for her. (Mettey Depo., at 133).

In December 2000, Ken Toureene left Cincinnati and Richard Robinson replaced him as Plaintiff's District Manager. (Mettey Depo., at 139). At that time, Plaintiff's numbers were still weak. Robinson, in his capacity as Plaintiff's Manager and in an effort to increase her to production, suggested a marketing plan to her. (Mettey Depo., at 140). Claiming that she knew better how to manage her time and that Robinson's suggestion was inappropriate, Plaintiff told Robinson that the plan would not work and she subsequently ignored it. (Mettey Depo., at 140, 156-57). Indeed, she expressed the belief that because she was already working hard, any type of production goal was unfair.[4] (Mettey Depo., at 145-46). Instead, she felt that "production was

---

[4] Plaintiff clarified that she thought it unfair that production numbers were not tailored to an agent's experience. (Mettey Depo., at 149). However, she did not believe that "allocation percentages," that is, a specified percentage of business generated in one product or another, were unreasonable. (Mettey Depo., at 150).

not everything" and she wanted quality business instead of mere quantity, intimating that she and American Family had different goals. (Mettey Depo., at 147, 163-64). American Family, concerned about the investment it had made in Plaintiff and its reputation, informed her that she would need to increase her numbers or face losing her agency. (Mettey Depo., at 145). Plaintiff agreed that it was appropriate that American Family track the numbers of its agents and that it had the right to address the issue of an unprofitable agency. (Mettey Depo., at 177).

Yet, despite Plaintiff's poor performance, American Family allowed her to continue. In June, 2000, Plaintiff's office suffered water damage from an accident elsewhere in her building; the subsequent repair period further adversely affected her production. (Mettey Depo., at 153). Between January, 2001 and May, 2001, Plaintiff and Richard Robinson met or communicated numerous times, addressing Plaintiff's faltering performance, among other issues. (Mettey Depo., at 183). Specifically, they had two meetings in May, 2001, May 2nd and May 9th , during which they discussed Plaintiff's agency budget for the coming year and how she was going to achieve her expected production. (Mettey Depo., at 188-89). Plaintiff admitted that the numbers she proffered as goals were "not new production numbers." (Mettey Depo., at 190). She had a plan, she claimed, to increase her production, such as developing a "center of influence" with a real estate agent. (Mettey Depo., at 190). Although she claimed that Mr. Robinson was pleased with her presentation, she cannot dispute what occurred next.

On May 10, 2001, Mr. Robinson wrote a letter to Plaintiff.[5] (Mettey Depo., at 185; Mettey Depo., Exhibit 3). Her attitude had changed, he noted, and Plaintiff agreed. (Mettey Depo., at 187). She was tired and had experienced "burnout." (Mettey Depo., at 191). Plaintiff

---

[5] Plaintiff has made her disdain for Mr. Robinson clear, despite the fact that she admits repeatedly that her production was subpar. (Mettey Depo., at 195, noting that "the big problem between Richard and I was he wanted to just count applications as – and say that that was what made a successful agency, and I wasn't buying that.").

agreed that the letter correctly noted her low production and that such low production was a result of her feeling that there was nothing she could do to save her agency, and on what she complains were "gestapo" type firings of other agents. (Mettey Depo., at 192). Again, though, Plaintiff does not dispute that her production was low in the first half of 2001.

So low that American Family eventually decided to terminate her agency. On July 23, 2001, Mr. Robinson asked for Plaintiff's resignation. (Mettey Depo., at 199). Plaintiff initially refused. (Mettey Depo., at 201-02). The next day, she went to her office as usual and found her computer access blocked. (Mettey Depo., at 203). Plaintiff next met with Cassandra Stiff. (Mettey Depo., at 205; Stiff Depo., at 12). At some point during their conversation, Ms. Stiff offered Plaintiff her agency back and Plaintiff refused. (Mettey Depo., at 205). Ms. Stiff explained to Plaintiff that Plaintiff's low production numbers were the reason her resignation was requested, specifically, the lack of new business and new applications. (Mettey Depo., at 206). Plaintiff, Mr. Robinson and Ms. Stiff developed an "exit plan" for the distribution of Plaintiff's clients and policies among other agents. (Mettey Depo., at 207).

Plaintiff has brought suit claiming breach of contract and in the alternative, a Fair Labor Standards Act claim. American Family now moves for summary judgment on each claim.


## II.    LAW AND ARGUMENT

### A.    Standard for Summary Judgment under Fed.R.Civ.P. 56

Summary judgment is appropriate if the pleadings and all supporting documentation show that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment, here American Family:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact.

Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548, 91 L.Ed.2d 265.  The moving party's burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.  A fact is "material" only if its resolution will affect the outcome of the lawsuit.[6]  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The court must view the evidence in the light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor.  Bender v. Southland Corp., 749 F.2d 1205, 1210-11 (6th Cir. 1984).

Once the moving party has discharged its burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue.  Fed.R.Civ.P. 56(e); Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995).  To create such a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue; she must produce evidence of "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265.

---

[6] Indeed, the Sixth Circuit has called the post-Anderson/Celotex period a "new era" in summary judgment.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1990).  This new era brings with it new principles, one of which is that a moving party may meet its burden by pointing out to the court that the non-moving party "having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." Id. at 1479. When adjudicating such a motion, the court should apply the directed verdict standard – "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id.  The non-moving party must present more than a "scintilla of evidence" to overcome the motion and may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact. Id.  Instead, the Sixth Circuit stated, the movant must present affirmative evidence to defeat a properly supported motion for summary judgment. Id.  Nor is mere "metaphysical doubt" as to the material facts enough, and indeed, a court has the discretion to determine whether the non-movant's claim is "implausible." Id. at 1480.  (Internal citations omitted).

Summary judgment should be granted if the party who bears the burden of proof at trial does not establish an essential element of their case. <u>Tolton v. American Biodyne, Inc.</u>, 48 F.3d 937, 941 (6th Cir. 1995), citing <u>Celotex</u>, 477 U.S. at 322, 106 S.Ct. 2548, 91 L.Ed.2d 265. Rumors, allegations, speculations, and unsubstantiated assertions are insufficient to defeat summary judgment. <u>See Gooden v. City of Memphis Police Dep't.</u>, 67 Fed.Appx. 893, 895 (6th Cir. 2003) ("conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment.").

**B.    <u>Plaintiff's Claim for "Breach of Contract" Must Fail.</u>**

At the outset, it must be noted that it is difficult to discern from Plaintiff's complaint exactly what she is asserting. The Complaint suggests a possible promissory estoppel claim, a breach of contract claim, and a claim for breach of the duty of good faith under Wisconsin law. None of these claims has any merit.[7]

1.    <u>The Agreement Had Productivity Terms.</u>

With respect to her breach of contract claim, she has asserted that the Agent Agreement, Advance Compensation Plan, and Agent Manuals did not contain any productivity terms and that Plaintiff, oddly, "fully and faithfully performed the contract." (Complaint, ¶30). In sharp contrast to her allegations, the Agreement specifically contemplated that production standards would be set. Section 4.h required that the agent "meet the Company's production, profitability and service requirements." Since the Agreement is silent with respect to the specificity of such requirements, it

---

[7] Wisconsin law governs the Agreement. (Agreement, 7.d). With respect to her promissory estoppel intimation, Plaintiff claims that American Family made promises to her during her recruitment and in the Agent Agreement on which she relied and on which she invested her "valuable time" in her agency. (Plaintiff's Complaint, ¶¶ 35, 37, 38, 39). Her claim for damages appears to include the "unjust enrichment" American Family received as a result of her work. (Complaint, ¶40). Such a claim is preposterous. Promissory estoppel exists only in the absence of a valid written contract, which, by her breach of contract claim, she concedes exists, or when the contract fails to address the essential elements of the parties' business relationship. <u>Kramer v. Alpine Valley Resort, Inc.</u>, 108 Wis.2d 417, 425-26, 321 N.W.2d 293 (1982). Furthermore, promises made to her during her recruitment disappear in the face of the

may be inferred that American Family would set them and alter such requirements from time to time depending on economic conditions and other business factors. Plaintiff either could not or would not meet the productivity and profitability requirements, which incidentally she had a large role in setting. Thus, American Family was justified in terminating the Agreement.

2.    <u>Plaintiff Was Not Required to Lease An Office, Hire an Employee, or Install a Sign.</u>

She then claims that American Family breached Section 4.k. of the Agreement (which specified that the agent shall incur the office expense at his or her discretion) because American Family required that Plaintiff lease an office, hire an employee, and install a sign. Yet American Family did none of these things. It was Plaintiff who decided to rent an office. (Stiff Depo., at 61, noting that there is no requirement to lease an office). It was Plaintiff who decided what employees she would hire, if any at all. American Family merely suggested to Plaintiff that she install an electric sign for better visibility, a suggestion she declined to take and for which refusal she suffered no harm. American Family did not assist her with procuring or operating her office. (Toureene Depo., at 36-37; Stiff Depo., at 46). Plaintiff did so on her own.

3.    <u>Plaintiff Was An Independent Contractor.</u>

Plaintiff next alleges that American Family breached the Agreement by treating Plaintiff as an employee and not an independent contractor, by requiring her to solicit applications for new insurance policies in a specific manner and time and by requiring sixty-five hours of service or more. Such an allegation is absolutely false, as the testimony reveals. Although this topic is discussed more exhaustively <u>infra</u> with regard to the FLSA claim, a few words will suffice here. First, for Plaintiff to assert that American Family breached its Agreement with her by requiring her to sell American Family products is preposterous -- that was what it engaged her to do!

---

valid written contract covering both parties' obligations and benefits. <u>See, e.g.,</u> <u>Federal Deposit Ins. Corp. v. First</u>

11

Additionally, there was no specific manner or time in which Plaintiff was required to sell policies. She was free to do as she pleased, so long as she in fact produced. (Stiff Depo., at 62). Perhaps Plaintiff's confusion comes from the fact that American Family, cognizant of the possibility of its investment ("ACP" and training) going down the drain, tried to assist Plaintiff with time-tested suggestions for time management and marketing. These were certainly not requirements because Plaintiff, by her own admission, ignored them, without repercussions and perhaps not coincidentally, continued to flounder.

4.      The Agreement Allowed Modification.

Plaintiff also alleges that American Family breached Section 7.a of the Agreement which specified that no modification could be made to the Agreement without the written consent of both parties. She claims American Family modified the Agreement unilaterally in January and May 2001 by setting a production level of new applications and new business commissions and by requiring her performance to meet the Company's business plan. Again, writing new business, selling policies and generating new business for American Family products is exactly what Plaintiff signed on to do in running her own agency. Furthermore, the Agreement specifically contemplated that Plaintiff would have a production requirement. Section 4.h required that the agent "meet the Company's production, profitability and service requirements." Although no specific production numbers are set in the Agreement, both parties anticipated that these requirements would change from time to time, as they did in January and May 2001. In any event, it was Plaintiff who set her goal of production in early 2001, delineating how many policies she intended to write, not how many American Family required that she write. (Stiff Depo., at 65-66).

5.      Plaintiff Did Not Request Review of Her Termination, But Received Such a Review Anyway

---

Mortgage Investors, 76 Wis.2d 151, 156, 250 N.W.2d 362 (1976).

Plaintiff then alleges that American Family breached Section 6.i of the Agreement which reserved to Plaintiff a right of review of any termination of the Agreement and that American Family failed to honor this right. First, the language of the Agreement reads: "In the event the Company terminates this Agreement, you may request a review in accordance with the Termination Review Procedure then in effect." (Agreement, 6.i). The Termination Review Procedure in place at the time provides:

> An American Family agent may request a review of the notice of termination by the office of the Vice President of Marketing. The review request must be in writing and mailed within five days after receipt of the written notice of termination. A copy of the request is to be sent to the appropriate Regional Vice President.

(Agreement, Agent Termination Review Procedure). Thus, this provision does not automatically confer a right of review, but instead Plaintiff had to request a review in writing within five days of receipt of the notice of termination. Plaintiff failed to do so, and thus, American Family was under no obligation to review her termination. However, even though Plaintiff had failed to request a review, Cassandra Stiff in fact reviewed Plaintiff's termination with her and offered her agency back. Plaintiff refused the offer. (Mettey Depo., at 205). It is thus disingenuous for her to complain that no review took place when in fact it did and at which American Family offered her to place her back where she was.

6.     The Client List, Goodwill, Files, Future Premiums, and Policies Were Not Plaintiff's Property.

Furthermore, Plaintiff either intimates or explicitly alleges that American Family retained the value of her client list, "goodwill," client files, right to future premiums, and other materials. This claim can be disposed of easily. First, Section 6.k of the Agreement required that Plaintiff return to American Family upon her termination "all policies and policy records, manuals, materials, advertising and supplies or other property for which [she] was a bailee." Thus, Plaintiff

13

knew at the outset that these materials were not her property, but in fact the property of American Family and she had a right to possess them only so long as she was an agent of the Company. Indeed, Plaintiff admitted at her deposition that her client base, customer files, and goodwill were the property of American Family. (Mettey Depo., at 211, 245).

       7.      <u>Plaintiff Was Never Offered a "Lifelong Career."</u>

At no time was Plaintiff ever promised a "lifelong career" with American Family, although that was certainly an option if she chose to perform well and stay with the Company. (Toureene Depo., at 69; Stiff Depo., at 59-60). Nor did anyone at American Family ever promise her that her renewal premium commissions were going to be her investment and her retirement. (Toureene Depo., at 69). No one promised her the rates would be equivalent to rates in other states. (Toureene Depo., at 69-70). In fact, American Family reduced its rates to assist its agents by being able to offer attractive premium rates and thus build a business in a scratch state. (Toureene Depo., at 70-71).

       8.      <u>American Family Did Not Breach the Implied Covenant of Good Faith.</u>

In the alternative (perhaps conceding that there is no breach of contract in this matter), Plaintiff claims that American Family breached the implied covenant of good faith attendant to every contract under Wisconsin law. Such a claim must fail as does her breach of contract claim.

Wisconsin law, which governs the Agreement, holds that every contract has an accompanying covenant of good faith. <u>See, e.g.</u>, <u>Estate of Chayka</u>, 47 Wis.2d 102, 176 N.W.2d 561 (1970), <u>cited in</u> <u>Foseid v. State Bank of Cross Plains</u>, 197 Wis.2d 772, 541 N.W.2d 203 (1995). In <u>Foseid</u>, the court held that a party may be liable for breach of the implied contractual covenant of good faith even though it has fulfilled all of the terms of the written agreement. <u>Foseid</u>, 197 Wis.2d at 796, 541 N.W.2d 203. The term "good faith" is often defined in the negative, that is, an absence

of bad faith.  Id.  The Foseid court cited the Restatement (Second) of Contracts § 205, cmt. A,

which provides that the concept of good faith "excludes a variety of types of conduct characterized

as involving 'bad faith' because they violate community standards of decency, fairness or

reasonableness." Discussing the concept of "good faith performance" the Restatement continues:

> Subterfuge and evasions violate the obligation of good faith in performance even
> though the actor believes his conduct to be justified.  But the obligation goes further:
> bad faith may be overt or may consist of inaction, and fair dealing may require more
> than honesty.  A complete catalogue of types of bad faith is impossible, but the
> following types are among those which have been recognized in judicial decisions:
> evasion of the spirit of the bargain, lack of diligence and slacking off, willful
> rendering of imperfect performance, abuse of a power to specify terms, and
> interference with or failure to cooperate in the other party's performance.

Id., citing Restatement (Second) of Contracts § 205, cmt. d.  Additionally, Wisconsin authority

holds that the implied covenant of good faith is violated only where the party to a contract is

"arbitrary and unreasonable."  Chase Lumber & Fuel Co. v. Chase, 228 Wis.2 179, 194, 596

N.W.2d 840 (Ct.App. 1999).  However, when the contracting party complains of acts of the other

that are specifically authorized in the agreement, Wisconsin courts have been reluctant to find a

breach of good faith and fair dealing.  See, e.g., M & I Marshall & Ilsey Bank v. Schlueter, 258

Wis.2d 865, 655 N.W.2d 521.  Perhaps most importantly, the implied covenant of good faith and

fair dealing cannot override a contract's express terms.  Wisconsin Natural Gas Co. v. Gabe's

Constr. Co., Inc., 220 Wis.2d 14, 21, 582 N.W.2d 118 (Ct. App. 1998).

Plaintiff identifies several items she alleges evidence a lack of good faith: 1) that her

production level prior to January 1, 2001 was at or above the median of all agents in her district; 2)

the arbitrary setting of her production level during 2001, and 3) the termination of the contract.

None of these claims has any merit.

First, Plaintiff relies solely on her protestations that her production level was "unfair" or

"unreasonable."  She complained basically from day one that she should not be held to any type of

15

standard at all.  (Mettey Depo., at 87, 90-91).  Plaintiff cannot reasonably argue that her production level was arbitrary since it was Plaintiff herself who set her 2001 production level, articulating how many policies she intended to write to be profitable.  (Stiff Depo., at 65-66).  Surely Plaintiff does not argue she set an arbitrary number for herself?

With respect to her claim she was at or above the median prior to January 1, 2001, such a claim is irrelevant.  Plaintiff's first district manager (Ken Toureene) has testified that Plaintiff was merely "a little above average" in the rankings of Ohio South agents.  (Toureene Depo., at 39).  While prior to January 1, 2001 Plaintiff's production might have been slightly higher than the median level in her district, the decision to terminate her was made based on her dismal performance in the first half of January 2001, a period that Plaintiff admits evidenced low production. (Mettey Depo., at 193).

Relative to the termination of the Agent's Agreement, Plaintiff's low production and her inability to increase it were actual occurrences, occurrences which permitted American Family to terminate the Agreement.  It is inconsistent to suggest that Defendant's compliance with the written terms of the Agreement, which specifically provided for termination constitutes bad faith, especially when Plaintiff has unequivocally admitted that her production was low.

**C.    Plaintiff's Claims Under the Fair Labor Standards Act Must Fail.**

Plaintiff claims that when American Family failed on August 1, 2001 to pay her overtime compensation and a minimum wage, it violated the Fair Labor Standards Act, ("FLSA").  Such a claim is absolutely unsupported by Plaintiff's testimony and the other evidence in this case.  First, in alleging a violation of FLSA, Plaintiff is suggesting that she was not an independent contractor. This suggestion conflicts directly with her claim that American Family breached its Agent's Agreement it held with her (i.e.,  conferring independent contractor status.)  As discussed, supra,

16

neither the allegation of a breach of the Agent's Agreement nor a violation of the FLSA has any merit.   At the outset, American Family draws this Court's attention to the provision in the Agreement which reads:

> It is mutually agreed that:
>
> It is the intent of the parties hereto that you are not an employee of the Company for any purposes, but are an independent contractor for all purposes, including federal taxation with full control of your activities and the right to exercise independent judgment as to time, place and manner of soliciting insurance, servicing policyholders and otherwise carrying out the provisions of this agreement.  As an independent contractor you are responsible for your self-employment taxes and are not eligible for various employee benefits such as Workers and Unemployment Compensation.

(Agreement, Section 6.a).  Thus, both parties specifically contemplated that Plaintiff would be an independent contractor, and not an employee.

Mutual contemplation and understanding that agents are independent contractors is evidenced by the testimony of Deb Harp.  Ms. Harp started as a scratch agent, in the same Ohio South District, Valley Region as Plaintiff, at approximately the same time that Plaintiff commenced her professional relationship with American Family.   However, Ms. Harp was successful in building her agency and testified

> . . . I do it all.  I'm responsible for finding business.  I'm responsible for underwriting the business.  I'm responsible for servicing the business.  It's just me and whoever I have in my office that I pay.  That's why I'm a business owner, because that's what I do, take care of my business.

(Harp depo., at 70, attached as Exhibit "E").

Under the Fair Labor Standards Act, only "employers" must comply with its overtime and minimum wage provisions.  29 U.S.C. § 203(d).  In deciding whether a party is an "employer" "economic reality" controls rather than common law concepts of agency.  Goldberg v. Whitaker House Cooperative, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961), cited in Dole v. Elliott

17

Travel & Tours, Inc., 942 F.2d 962 (6th Cir. 1991).  Whether a party is an employer within the meaning of the FLSA is a legal determination.  Dole, 942 F.2d at 965.

Of course, the tests for whether a person is covered as an "employee" under the various employment laws vary widely in scope and substance.  The Sixth Circuit has recently affirmed the use of the "economic reality test" in a case involving the status of an independent contractor under the FLSA.  In Imars v. Contractors Manufacturing Services, Inc., it stated that "the definition [should] be determined in light of the purposes of the legislation' so that 'employees are those who as a matter of economic reality are dependent upon the business to which they render service.'" 165 F.3d 27, 1998 WL 598778 (6th Cir. Aug. 24, 1998), quoting Donovan v. Brandel, 736 F.2d 1114, 1116 (6th Cir. 1984).  The Sixth Circuit continued:

> Put another way, the multi-factor "economic realities" test "looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself.  This test is a loose formulation, leaving the determination of employment status to a case-by-case resolution based on the totality of the circumstances.

Id., citing Lilley v. BTM Corp., 958 F.2d 746, 750 (6th Cir. 1992) (citations omitted).  Summary judgment, however, is appropriate when there is no genuine issue of material fact because, as noted above, the question of whether a particular relationship is an employment relationship is a question of law.  Fegley v. Higgins, 19 F.3d 1126, 1132 (6th Cir. 1992), citing Brandel, 736 F.2d at 1116.

The six factors that the Sixth Circuit has articulated to determine whether the relationship at issue is one of  employment or one of an independent contractor are: 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the workers' investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; 5) the degree of the alleged employer's right to control the manner in which the work is performed; and 6) whether the service rendered is an integral part of

18

the employer's business. <u>Brandel</u>, 736 F.2d at 1117. The Sixth Circuit has also cited with approval the basic question of whether, as a matter of economic reality, the worker is "in business for himself." <u>Imars</u>, 1998 WL 598778 at *5, citing <u>Robicheaux v. Radcliff Mat'l</u>, 697 F.2d 662 (5th Cir. 1983). Balancing these factors, there is no genuine issue of material fact that Mettey was an independent contractor of American Family.

**Permanency of the Relationship.** Either party could terminate the Agreement at any time, as evidenced by Section 6.h of the Agreement. There was no fixed term and no minimum amount of time that Plaintiff or any other agent had to spend as an independent contractor.

**Degree of Skill.** Plaintiff, by her own admission, came to American Family with a fair amount of skill and experience as a sales person in an independent contractor capacity. (Mettey Depo., at 10-16). She subsequently earned licensure from the State of Ohio to sell insurance, an endeavor entailing learning and passage of licensure examinations. (Mettey Depo., at 45). Certainly, American Family provided her training on its policies and procedures, but the inherent high degree of skill that Plaintiff claims she had prior to her agreement with American Family balances in favor of her status as an independent contractor.

**Worker's Investment in Equipment or Materials for the Task.** Operating her own agency was Plaintiff's own investment in her business, which she assumed she would do from the time she interviewed with American Family. (Mettey Depo., at 55-56). Certainly, recognizing the difficulty of creating and operating a business in a "scratch" district or "scratch" state, American Family offered the Advanced Compensation Plan to assist its independent agents until such time as they could operate fully on their own. (Mettey Depo., at 67, 69). But this money was given to Plaintiff to spend as she saw fit; she chose to spend hers on an office and advertising materials. (Mettey Depo., at 70-73). The breadth of her discretion she enjoyed as to how to spend her funds

is illustrated starkly by a relatively simple matter – the sign. Despite the suggestion that it would increase her visibility and thus her business, Plaintiff declined to purchase it, as was her right as an independent contractor. She suffered no repercussions for this refusal. (Mettey Depo., at 264).

She also spent her own money to rent a cubicle at American Family's offices and a phone line at American Family's offices. (Mettey Depo., at 95-96). She had a separate bank account (separate from American Family premium funds) for her office and agency expenses, including salaries for her and employees she chose to hire. (Mettey Depo., at 105-06). In fact, she decided when she was eventually able to hire a full-time staff person for her agency. (Mettey Depo., at 154).

**Worker's Opportunity for Profit or Loss.** Plaintiff's earnings were entirely within her control. She had no fixed compensation; indeed her earnings were completely dependent on her own efforts. Simply put, the more products she sold, the more money she would make. Plaintiff's independence in setting her own compensation goals is illustrated by her dispute with Richard Robinson about sales. Plaintiff claims she wanted to focus on "good business" which to her was business that would renew and had the potential for future commissions. (Mettey Depo., at 147, 150). She claims that Mr. Robinson simply wanted numbers, an approach she disputed.[8] (Mettey Depo., at 147, 195). What she cannot dispute is that higher numbers would mean more commission and thus, more income for her. The method to achieve higher numbers was left up to her. She cannot dispute either that by the time of her termination, her production had slipped to the point where she was having difficulty making a living. (Mettey Depo., at 152-53). Again, such a risk is always attendant to an independent contractor arrangement, one survives or not based on her efforts.

**Degree of Right to Control By Alleged Employer.**  It cannot be disputed that Plaintiff was an independent contractor engaged by American Family to sell its insurance products.[9]  To that end, American Family appropriately provided her with training on its over one hundred insurance products and held periodic meetings to educate its agents about its products, to assess progress and share updates.  (Mettey Depo., at 110; Toureene Depo., at 54-57).  Providing a forum within which to better yourself from a business standpoint does not evidence control.  In fact, Plaintiff was not required to attend these educational opportunities. Plaintiff claims that she was forced to adhere to a time management and marketing plan, but such is not the case.  Indeed, she even admitted she did not even attempt to adhere to such plans.  (Mettey Depo., at 157, 182).   These tools were presented to her as suggestions to a floundering agent who could not seem to make a go of it.  Instead, Plaintiff preferred to do things her own way – soliciting from people she knew and developing what she termed a "center of influence."  (Mettey Depo., at 93, 190).  In fact, Ken Toureene testified that if an agent found other ways to make herself successful, American Family would have entertained them.  (Toureene Depo., at 61).

She does not and indeed cannot dispute that her production was low in the first half of 2001.  (Mettey Depo., at 193).  Her termination did not occur because of her refusal to adopt American Family's suggestions; rather, her termination was based on her failure to produce in any manner, using any methods.  Plaintiff agreed with this assessment.  (Mettey Depo., at 177, agreeing that the Company could address the issue of an unprofitable agency and admitting that it was her responsibility to attract new business and hit her production levels.  Mettey Depo. at 234, 236.)   In

---

[8] Plaintiff clarified that she disagreed with the approach of not tailoring production numbers to an agent's experience. (Mettey Depo., at 149).

[9] Even a current agent of American Family, Ken Toureene, agrees.  (Toureene Depo., at 63).

short, an agent determines his or her own productivity based on his or her financial needs. (Mettey Depo., at 26-27).

Indeed, Plaintiff is the only one with a perception that use of her time was dictated to her. Ken Toureene testified that he did not require certain activities at certain times and while the district as a whole had a marketing plan, "we had ideas, but I really didn't care how they [the agents] did it as long as they got it done." (Toureene Depo., at 43, 44, 45). He also agreed that the manner in which an agent conducted her business was up to her; if the methods one uses perform well, no need to do it in another way. (Toureene Depo., at 61). Plaintiff was not required to work a set number of hours, but certainly, the more hours she worked, the more sales she had potential to make and the more profit she would earn. (Toureene Depo., at 58, noting that a sixty-five-hour workweek is not expected; Stiff Depo., at 33). Moreover, she was not required to attend events or submit daily reports. (Stiff Depo., at 22-23).

**Whether Service Rendered is An Integral Part of Business.** Although it cannot be disputed that American Family is in the business of selling insurance and that was what it contracted with Plaintiff to do, it must be noted that Plaintiff was at the core, in business for herself, not for American Family.

## III.  CONCLUSION

Defendants are entitled to summary judgment in their favor on Plaintiff's inherently contradictory claims of breach of contract and violation of the Fair Labor Standards Act. The facts are undisputed and support the conclusion that 1) no breach of contract, promissory estoppel, or breach of the covenant of good faith occurred, and 2) Plaintiff was an independent contractor and therefore does not qualify for FLSA protection.

Wherefore, Defendants respectfully request that this Court GRANT its motion for summary judgment on each of Plaintiff's claims.

Respectfully submitted,

*Geraldine M. Johnson*

Geraldine M. Johnson (0010450)
ROETZEL & ANDRESS
310 Chiquita Center
250 East Fifth Street
Cincinnati, Ohio 45202
(513) 361-8288
(513) 361-8280 FAX
gjohnson@ralaw.com
ATTORNEY FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Motion for Summary Judgment was served upon the following via regular U.S. mail this 20th day of July, 2004 to:

John Rebel, Esq.
McKinney & Namei Co., LPA
15 East Eighth Street
Cincinnati, Ohio 45202

*Geraldine M. Johnson*

Geraldine M. Johnson        (0010450)
Attorney for Defendants,
American Family Insurance, et al.

1164446v1

23