## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Ronda A. Mettey | : | |
| | : | |
| Plaintiff, | : | **CASE No.   C-1-02 398** |
| vs. | : | |
| | : | Judge Spiegel |
| American Family Mutual Insurance | : | |
| Company,  et al | : | Magistrate Black |
| | : | |
| Defendants. | : | **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; PLAINTIFF'S AFFIDAVIT; APPENDICES- EVIDENCE** |

***Summary***

Defendants breached  *Section 6.(a)* of the Agent Agreement by treating Plaintiff as an employee rather than an independent contractor.  As a direct result of Plaintiff's reliance on *Section 6.(a)* and other contract terms,  Plaintiff lost moneys expended on office expenses ($75,000), and lost her service  time to American Family, in excess of sixty hours per week, for over three years (valued at $ 200,000.00), and obligated herself to not compete for one year ($50,000). These are reliance damages in excess of $ 310,000.00.  Furthermore there are enrichment damages. The covenant of good faith and fair dealing is also breached.  The breaches of the contract occurred prior to the termination of the contract.

There is an alternate claim for minimum wage and overtime under the Fair Labor Standards Act.

Plaintiff has no objection to granting Defendant's motion as to the Second Claim for unjust enrichment and the Third Claim for promissory estoppel.

*Facts:*

Plaintiff, Ronda A. Mettey,(hereinafter "Mettey") initially met Defendants' employee Ken Toureen at a Job Fair during late 1997. Plaintiff was recruited by Defendants (hereinafter referred to as American Family). Plaintiff had no prior experience as an insurance sales agent. She had a high school equivalency certificate. During recruitment Toureen  told Mettey that an American Family agency is an opportunity to own your own business, with unlimited income potential, and freedom of schedule. Risks were not discussed. Toureen  noted it was  not a 40 hour per week job (Toureen Depos. p 14)[1].  Mettey remembers being told that the agency would be an investment for her retirement (Mettey Depos. p56)[2].  None of the recruiter-district managers had any idea of how slow the process would be. When under recruiting pressure the district managers did not disclose to the recruit all the realities of being agent (Begin, Depos. p51)[3].The problems agents faced included: lack of public recognition in a new sales state, being scratch agents, no prior insurance background and low premiums  (Begin, Depos. p 48, 49).The recruiters had some idea of how difficult it would be, but the recruited agents had no idea (Begin, Depos. p 49).

Mettey was licensed to sell insurance by the state of Ohio during April 1998. On May 1, 1998 she entered the Agency Agreement and the Advanced Compensation Plan (hereinafter referred to as ACP) with American Family. The amount of ACP payment in theory varied. But in practice

---

[1]   Deposition of Kendall Toureen attached to Defendants' Motion for Summary Judgment, as Defendants' Exhibit B; Exhibits identified by Toureen are attached hereto. See Appendices at end.

[2]   Deposition of Ronda A. Mettey attached to Defendants' Motion for Summary Judgment, as Defendants' Exhibit A; Exhibits identified by Mettey are attached hereto. See Appendices at end.

[3]   Exerpted Deposition of Kevin Begin is attached hereto.  See Appendices at end.

ACP was a fixed $ 2,500.00, maximum (Toureen, Depos. p21), that was dictated by Cassandra Stiff, the Sales Director for Ohio South (Begin Depos. p 18). The District Managers made the numbers work by computing a new business monthly commissions that equaled the agent's budget expenses less the ACP of $2,500 (Begin Depos. P.18).

Plaintiff's first District Manager was Ken Toureen. With her budget data and the fixed ACP amount of $ 2,500.00, Plaintiff's amount of new business commissions was computed at $ 1,914.00. This amount was admittedly not realistic, it should have been $1,000 to $1,200 (Toureen Depos. p29). The expected new business commissions of $ 1,900.[4] was memorialized in Ken Toureen's expectation letter dated May 14, 1998 (Toureen Depos. Exh 2, p16, Metty Affid. Exh. N). Plaintiff questioned the appropriateness of the $ 1,900.00 of new business commissions per month. Toureen said that the letter is just for the file and treated it lightly (Mettey Depos. p91). While the letter expected 30 appointments per week with PIR (Personal Insurance Review), Toureen admitted that it would be very hard to run 30 face to face appointments (Toureen, Depos. p27).

The expectation letter of May 14, 1998 (Mettey Depos. p87, Mettey Affid. Exh. N) required daily reports. Its production requirement and daily activities were realistic, but the $ 1,900 per month of new business commissions was not (Toureen, Depos. p29). No uniform standards of production were used to judge an agent's performance (Toureen, Depos. p33). When Toureen terminated an agency production was only one reason (Toureen, Depos. p33). The agent would have to be well below 40 applications per month to terminate. He would not terminate if $ 1,500 new business per month(Toureen, Depos. p35). Mettey was a little above average agent. Mettey was

---

[4]     If the average value of a new policy commission is $21 then new business of $ 1,914 equals 90 policies per month. If the average premium is $ 27, then $1900 divided 27 equals 70 policies per month.

accepting of Toureen's suggestions. She liked to meet face to face. She attended events. She wanted quality over quantity (Toureen, Depos. p38-39).

Mettey worked in American Family's Ohio South Sales state, which had its office in Mason Ohio. From May 1998 through September 1998, she was required to work at American Family's Mason office (Mettey Depos. p94, 95). From her ACP, office expenses for the cubicle in Mason office were deducted. She received substantial amounts of training (Mettey Depos. p 98, 99,104, 110,112, 119, 120). During September 1998 she opened her office on Blue Rock Rd. Cincinnati, Ohio. The district manager helped her find the location and was present at the signing of the lease (Mettey Depos. p265) (Toureen Depos. 37). Mettey employed a part time staff person in her office.

Monthly meetings with the district manager were 6 to 7 hours long (Toureen, Depos. p54)(Mettey Affid. ¶ 4). State meetings with the Sales Director were a few times per year and lasted all day. There were other events for which attendance was mandatory (Mettey Affid. ¶ 21).

The agency was a scratch agency, that is it had no policy holders initially. The sales state was also a scratch region. American Family was new to southern Ohio. There were no production levels set for the agents. During 1999 Mettey was setting the sales goals for her agency (Mettey Depos. p122,123,124). For 1999 she averaged about 30 new policies per month. During 2000 she averaged about 24 per month and during the first half of 2001 she averaged 20 new policies per month. During June 2000 Mettey's office was flooded. While it was rebuilt, she had no office for several months. Consequently her new application rate fell from 35 policies per month to 20 per month. Mettey could not afford a staff person during the latter half of 2000. During November 2000 Mettey's ACP was increased from $2,500 to $ 3,000 per month (Mettey Affid. ¶ 1).

The regional sales director, Cassandra Stiff, (hereinafter referred to as "Stiff") was in the

habit of dictating tasks that she wanted the agents to do (Toureen Depos. p 43)(Mettey Affid. ¶ 12). The sales director was the supervisor of the district managers who were employees of American Family. She required that the agents work on Saturday morning (Toureen Depos. p 45). Mettey had been in the habit of working Saturdays anyway. During 2000 one hundred agents left the Ohio South Sales State. Metty complained to Toureen that the day long state meetings were a waste of time. He replied that she should lower her standards (Mettey Depos. p133).

Plaintiff's business plan was to have a profitable business by building a client base that would remain with her. She did not plan to sell a large volume of high risk automobile insurance (Toureen Depos. p38-40). While this might give her a high production rate, it would not build a stable client base for return business (Mettey Affid. ¶ 11). By March 2004 the company's focus changed from productivity to profitability so that the average new policy applications decreased from in the 40's to in the 30's, (Stiff Depos. p.45)[5].

On the January 8, 2001 letter Mettey's new District Manager, Richard Robinson for the first time set production levels (Mettey Affid. ¶ 29, Exh. L, Mettey Depos. p 157). In response to Mettey's question on the mix of the policy handwritten notes were made (Mettey Depos. p 182, 183, Mettey Affid. Exh. K). When the levels were set he stated: "will meet or not stay in business and have an agency" (Mettey Depos. p129). Stiff instructed the District Manager to instruct their agents to work specific schedules. At certain hours doing cold calls, running appointments. She wanted the whole week mapped-out. Stiff wanted all agents to work Saturday morning 9:00 to 12 or 9:00 to 1:00, to increase production (Begin p.28). A few District Managers were not in agreement: How

---

[5]     Deposition of Cassandra Stiff attached to Defendants' Motion for Summary Judgment, as Defendants' Exhibit D; Exhibits identified by Stiff are attached hereto. See Appendices at end.

can we tell agents do this if they are independent contractors (Begin p.29). During December 2000 Robinson, in consultation with Cassandra Stiff, provided each agent in his district with the 232 Marketing Plan (Robinson Depos. p 40, Mettey Affid. Exh.D)[6]. It had the times of the day for each day of the week and the task that the agent was to perform (Mettey Affid. ¶ 13, Exh. D). Mettey objected to this and was told by Robinson "Agents are like infants. They don't know what they need." (Mettey Depos. p157).

Robinson faxed a resume to Mettey indicating that she ought to hire the designated person (Mettey Depos. p231). Evening and Saturday telemarketing sessions at Mason office were required. Agents met and cold called in evening. Cold calling in Cincinnati was difficult. An agent might cold call for four hours and get two appointments. Kevin Begin a district manager did not believe in cold calls. (Begin, Depos. 32).

Robinson did not like her office. He wanted her to have a store front (Mettey Depos. p265). Under the 232 Marketing Plan Mettey would have been working, at least, 60 hours per week (Mettey Depos. p.265). Mettey was negotiating with Robinson for the right to manage her own time. American Family was demanding to control how, when and where Mettey sold insurance.

Many agents had quit or were forced to resign. There names are: Jody Godfrey, David Wornstaff, Roger Emory, Tamara Reed, Charlie Hayes, Scott Chrismon, Theresa Allen, Margaret Stratman, Ted Ford, Donna Norvell, and Gary Lewis (Mettey depos. 174). When agents signed on they did not know they had to meet specific sales numbers. In addition to sale of new policies, other factors measure an agent's performance. Profitability of the policies sold, in other words there are no claims. Retention of the policy holder is measured by the total number of policies serviced by the

---

[6]     Exerpted Deposition of Richard Robinson is attached hereto.  See Appendices at end.

agency.

District managers are employees of American Family (Begin, Depos. 7). Agents assessed the risk (Begin, Depos. 35). The district manager accompanies the agent to do underwriting (risk assessment) for commercial insurance. Both commercial and homeowners are subject to re-inspect by a loss control person. During 1999  Ohio South had a loss control person underwriting re-inspections (Toureen, Depos. p48). For homeowners insurance agents do all the underwriting. (The agent inspect the roof, electrical wiring, panel box, and photographs the home). All of underwriting information is transmitted to Columbus Ohio, by the agent. It is time consuming to do (Begin, Depos. P.35, 36). Some homes are re-inspected by American Family (Toureen, Depos. p49). Mettey did a significant amount of re-inspections and re-calculations replacement costs of buildings, as requested by the corporate office (Mettey Affid. ¶ 17) after the sale of the policy.

Cassandra wanted agents to be more involved with transmission of claims information to the call center (Begin, Depos. p.37,  Mettey Affid. ¶ 19).   Agents adjusted auto-accident-property claims and pay them if less than $ 2,500 (Toureen, Depos. p50). Clients come to the agent's office to pay premiums (Toureen, Depos. p52).

Mettey had daily contacts with Robinson between January 2001 and May 2001.  After Robinson dictated production levels to her along with a threat of losing the agency, Mettey's enthusiasm waned. She thought that she would be terminated since so many other agents had been forced to resign. At the same time she resisted the various demands of the company on her time (Mettey Depos. p186-187). During the May 2001 meeting discussed with Robinson her plan for increasing sales by developing centers of influence with realtors, Mettey thought that she had turn Robinson around and convinced him that she could run her agency. There was no discussion of her

low performance by Robinson. On July 23, 2001 Robinson came to Mettey's office and asked for her resignation. She refused and escorted him out of the office and spoke with him in the hall. Mettey was unwilling to resign due to the large amount of money and time she had expended. The next day the computer was turned off. Mettey called Cassandra Stiff. They had a meeting and Robinson was present. Cassandra had a list from Robinson that included: "not following the Managers Directions" and her complaints about not following Robinson's claim system (Mettey Affid. ¶ 30, Exh.O). Stiff stated that termination was for production. But Mettey was offered the job back. She did not want it, if she was to be an employee instead of an independent contractor.

On July 25, 2001 Mettey thought Robinson was coming to create and exit plan instead he arrived with a computer technician who removed computer and Robinson not only took files but various promotional material that Mettey had purchased and a stack of insurance quotes.

Damages of $ 200,000 is her value of time spent. It equals the amount of earnings for 30 hours per week at her position prior to American Family and using 65 hours of work for week for American Family (Mettey Depos. p 247). Mettey worked in excess of 60 hours per week for American Family (Mettey Affid. ¶ 27). Toureen as an agent gives his current weekly schedule as an agent which equals 60 hours per week (Toureen, Depos. p58). Deb Harp an agent admits that she works 70 hours per week without counting time at home stuffing envelopes (Harp Depos. p 20)[7]. Mettey spent $ 15,000 of her savings on office expenses. She paid her office expenses of $ 20,000 per year from the compensation received from American Family.

---

[7]     Deposition of Deb Harp attached to Defendants' Motion for Summary Judgment, as Defendants' Exhibit E; Exhibits identified by Harp are attached hereto. See Appendices at end.

**Agent Agreement dated May 1, 1998**

The agent's obligations are at *Section 4.* of the Agent Agreement[8]   *(a)* To exclusively represent American Family *(d)* To deliver policies and collect premiums as trustee for American Family,  *(h)* To meet the Company's production, profitability and service requirements.  *(k)* The expenses of the office were at the discretion and the liability of the agent. Nowhere to be found are agent's obligations to do: claims processing, make claims payments, re-inspect and re-evaluate replacement costs after policies in place, and the myriad of other non-sales tasks the agent was required to perform.

The mutual obligations are a *Section 6. (a)* It is the intent of the parties that the agent is not an employee but is an independent contractor for all purposes "with full control of your activities and the right to exercise independent judgment as to time, place and manner of soliciting insurance, servicing policyholders and otherwise carrying out the provisions of this agreement." *(d)* American Family retained the right to amend compensation schedules. *(k)* after termination the agent is prohibited from inducing the agent's clients to switch away from American Family. *Section 7. (a)* The agreement is modified in writing by the agent and the company. *(d)* Wisconsin law governs the agreement. The Corporate Code of Ethics is incorporated into the agreement.

**Agent Advance Compensation Plan dated May 1, 1998**

The amount of ACP is initially $ 2,500 per month. *Section 3 (d)* of the Advance Compensation Plan[9] automatically terminates the ACP agreement if the agency agreement is

---

[8]   The Agent Agreement is attached to the First Amended Complaint as Exhibit A, it is also attached to Defendants' Memorandum in Support of Summary Judgment as Def. Exh. C.

[9]   The ACP is attached to the First Amended  Complaint as Exhibit B, it is also attached to Defendants' Memorandum in Support of Summary Judgment.

terminated. *Section 4 (d)* "If your agency agreement is terminated, your obligation to repay advance compensation under this agreement is released and discharged except that you assign and transfer to Mutual all rights to all bonuses, extended earnings, compensation after termination or any other monies due under the Agent Agreement." American Family wrote to Mettey warning that if *Section 6(k)* of the Agent Agreement was violated there would be an obligation to repay the ACP.

### Parties' Dilemma

The Agent Agreement *Section 4. (h)* has the agent's obligation to meet the Company's production , profitability and service requirements.    Production (sale of new policies), profitability (no claims on policies) and service (non-paying work, policy changes, fielding questions) are frequently conflicting. Mettey points out that high sales from high risk auto insurance will negatively impact profitability. One month of high sales will be followed by a month of excessive policy servicing, so that there is no time to sell. To remedy the situation the agent must spend more of her to hire staff or more of her time. This is counter to   *Section 6. (a)*'s promise of full control of your activities. If the agent persists in building her renewal commissions with quality policy holders, then the dilemma recedes. The agents compensation equals new business commissions plus ACP less renewal commissions. When ACP stops compensation equals new business commissions plus renewal commissions. (ACP stops when renewal commissions equal ACP.)

### Good Faith Covenant

Wisconsin law implies the duty of good faith and fair dealing in every contract. Compliance in form but not in substance violates good faith, *Estate of Chayka*, 47 Wis. 2d 102, 107-108, 176 N.W.2d 561 (1970). Wisconsin appellate decisions have adopted Restatement 2nd  Contracts § 205 and its *Comment d.* which define good faith to exclude conduct characterized as involving 'bad faith'

which violates community standards of decency, fairness or reasonableness.  Subterfuges and evasions violate good faith. Fair dealing may require more than honesty. Bad faith includes "abuse of a power to specify terms," *Foseid v. State Bank*, 197 Wis. 2d 772, 796, 541 N.W.2d 203,213 (App. 1995). See *Wisconsin Natural Gas Co. v. Gabe's Constr. Co.*, 220 Wis. 2d 14, 21, 582 N.W.2d 118, 121 (App 1998) which notes that "a good faith covenant cannot override a contract's 'express' terms, obligations under those terms must be performed subject to that implied covenant." "[A] party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled," *Foseid v. State Bank*, 197 Wis. 2d 772, 796, 541 N.W.2d 203, 212 (Ct. App. 1995). The good faith rule is a guarantee against arbitrary or unreasonable conduct by a party, *Travelers Ins. Cos. v. Keller*, 260 Wis. 2d 601; 658 N.W.2d 87 (App 2003), *Foseid v. State Bank*, 197 Wis. 2d 772, 796, 541 N.W.2d 203 (Ct. App. 1995). The duty of good faith means that a party to a contract will not do anything that injures or destroys the right or ability of the other to receive its benefits under the contract. Wis. JI-Civil 3044. The touchstones of good faith are honesty and reasonableness. *Schaller v. Marine Nat'l Bank*, 131 Wis. 2d 389, 403, 388 N.W.2d 645 (Ct. App. 1986). Good faith applies in an express employment agreement terminable at will. *MacGillis v. Marquette Univ.*, 181 Wis. 2d 364, 514 N.W. 2d 421 (App. 1993).

The good faith covenant was first breached with the expectation letter dated May 14, 1998. There was subterfuge, and not full disclosure of the risks and need for large monetary and time investments. There was no disclosure of the many tasks in addition to selling insurance that were required by American Family.  The budget including personal and business expenses ($4,400) less

the constant maximum ACP amount of $ 2,500.00 equaled the new business commissions ($1,914).[10]
It is clearly impossible for a new scratch agent, with no prior experience as an insurance sales agent
to achieve these levels, without investing money or excessive amount of time. Toureen knew that
30 face to face appointments per week and the new business commissions of $ 1,900 were not
achievable (Toureen, Depos. p 27, 29). Very few agents had over 60 new applications per month
(Begin, Depos. p49).

Section 4.(h) productivity and profitability requirements  and 7.(a) on mutual written
modification were breached by American Family since it set its productivity in an unreasonable and
arbitrary manner. No uniform standards of production were used to judge an agent's performance
(Toureen, Depos. p33).  The production level set by Robinson was the level of the top 5% of the
sales agents. Mettey was being held accountable to a bar that does not exist. (Mettey Depos. 179).

Good faith is also breached by Defendants increasing the scope of the agents performance
to so many non-sale functions, beyond the obligations of the Agent Agreement.

Plaintiff's position is that the district manager and regional sale director became upset with
her when she resisted their interference in the running of her business; namely,  when she resisted
the violation of her right under  Section 6.(a) to be an independent contractor. This precipitated her
termination (Mettey Affid. ¶ 24).

**Breach of Independent Contractor Promise**

The district managers and sales director were unaware of an  American Family definition of
"independent contractor"or any guidelines delineating an employee from an independent contractor
(Toureen, Depos. p18) (Begin, Depos. P.39) (Stiff Depos. p 44).   Wisconsin law defines

---

[10]    See ft. nt. 4.

"independent contractor" as "'..........one who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work in accordance with his own ideas or under plans furnished by the person for whom the work is done, to produce certain results required by such person. . . .'"*Saunders v. DEC International, Inc.*, 85 Wis. 2d 70, 77,  270 N.W.2d 176 (1978).  "Servants are employees who are physically controlled by their masters, while independent contractors are not controlled as to their physical conduct by the persons who hire them. Restatement (Second) of *Agency* (1957), sec. 2. The crucial distinguishing feature of independent contractors as opposed to servants is lack of physical control, not production of results," *Saunders v. DEC International, Inc.*, 85 Wis. 2d 70, 77. "An *independent contractor* is a person who contracts with another to do something for him, but who is not controlled by the other, nor subject to the other's right to control, with respect to his physical conduct in the performance of the undertaking," *Arsand v. Franklin*, 83 Wis. 2d 40, 264 N.W.2d 579 (1978). The Wisconsin Supreme Court defines "independent contractor" as a person employed on terms that he is to be free from the control of the employer as respects the manner in which the details of the work are to be executed, *Mueller v. Luther*, 31 Wis. 2d 220, 225, 142 N.W. 2d 848, 851 (1966).

Numerous facts  evidence the physical control of American Family over Mettey.  The April 30, 2001 e-mail to Mettey on the Soaring Eagles Class stated:  " **They are not elective**. They **MUST** take first priority on your planner. This block of time should be set aside and nothing should interfere with your attendance for the entire session." (Stiff Depos. p 42, Mettey Affid. ¶ 13, Exh. D). The 232 Marketing Plan (Mettey Affid. ¶ 13, Exh. D) had specific tasks to do each day  Monday through Saturday. The district manager meetings agendas from 2001  (Mettey Affid. ¶¶ 14, 15, 16, 19-22, Exh. E-I)) and Mettey's Affidavit evidence the requirements: to cold call in evenings at

Mason (Begin Depos. p54) and on Saturday mornings (Mettey Depos. 239, 240), to enroll in pay programs for leads, to follow the 232 Marketing Plan, to attend special events and to only use two methods for premium payment.

A specific "scripting track" or message to the prospective life insurance customer (Stiff Depos. p38) (Mettey Affid. ¶ 13, Exh. D on e-mail) was required. Daily reports ( 5/14/98 letter Mettey Affid. Exh. N ) and weekly reports (Toureen Depos. p42) were required. Saturday services (Begin Depos. p29, Toureen Depos. p45) mapping-out whole week for agent, cold calls at specific times, running appointments at set times of day (Begin Depos. p.28) were required by the sales director.

During May 1998 Mettey was required to lease a cubicle and install telephone line at Mason Ohio regional office (Mettey Depos. p94,95). During her first year,  training in Wisconsin and locally (Mettey Depos. p99, 104, 110, 117, 119) was mandated. District monthly meetings lasted 6 to 7 hours (Toureen Depos. p.54).  The first action of the new  District Manager Robinson was to dictate that specific sales tasks, be done at specific times-- that cold calling be done at a set time, -- that mail drops and appointments be done a set times of the day (Mettey Depos. p140)(232 Marketing Plan Robinson Depos. p 40, Exh 20). When the levels were set he stated: "will meet or not stay in business and have an agency" (Mettey Depos. p129). Each agent in district received the 232 Marketing Plan.   Mettey told Robinson that marketing plan would not work --wrong time of day and not enough time allotted to certain tasks (Mettey Depos. p156).  Mettey objected to this and was told by Robinson "Agents are like infants. They don't know what they need." (Mettey Depos. p157). Mettey thought she negotiated for right to manage her own time during spring of 2001 (Mettey Depos. p172, 191). Mettey was no longer willing to overlook American Family's control

over her (Mettey Depos. p186-187).

A "suggestion" or a "request", by one who has the power to terminate at will, an agent who stands to lose her large dollar and time investment is control. See *Luther v. Z. Wilson*, 528 F. Supp. 1166, 1169 (S.D. Oh. W.D. 1981).  Numerous agents had been forced to resign (Mettey Depos. pp133, 174). Agents felt threatened (Mettey Depos. p143). Physical Control is corroborated by discussion of earn-premium back dating (Harp Depos. p 40-45) (Robinson Depos. p30-31). Much evidence is present that American Family maintained physical control over the agents, especially one considered to be struggling such as Mettey. The evidence is documentary. It is from several witnesses. Exercising physical control over the acts of the agent caused the agent not to be an independent contractor and thus breached the *Section 6.a.* of the Agency Agreement. It is clear that the parties intended that the agent have full control of her activities and time as a sales agent. In reliance on that promise, Mettey invested $ 75,000. plus 65 hours per week for 3.25 years.

The breach occurred prior to the termination, so at the minimum Mettey is entitled to reliance damages.  American Family's  breaches ended Mettey's duty to perform. Mettey as  the injured party, has the right under general contract law "to suspend her own performance and ultimately to refuse it" and, if the American Family's nonperformance of the independent contractor clause "is not justified, to claim damages for total breach of contract."[11]

### Fair Labor Standards Act

Plaintiff seeks relief under the Fair Labor Standards Act (FLSA) for minimum wage (29 U.S.C. § 206), one and one-half wages for work in excess of forty hours per week (29 U.S.C. § 207)

---

[11]    See Restatement 2d Contracts Introduction to Chap 10 - Performance and Non-Performance. § 243 enumerates instances where non-performance gives rise to damages for total breach.

and liquidated damages for willful violations (29 U.S.C. § 216(b)). Since the FLSA is remedial, the status of covered employee is broadly construed. Protected "employees are those who as a matter of economic reality are dependent upon the business to which they render services," *Donovan v. Brandel*, *Imars v. Contractors Mfger*. 165 F.3d 27 (6th Cir. 1998).

If material facts are sufficiently disputed then Summary Judgment is not appropriate *Imars v. Contractors Mfger*. 165 F.3d 27, 1998 App. LEXIS 21073. Whether a worker is an employee is a mixed question of law and fact *Lilley v. BTM Corp*. 958 F.2d 746 (6th Cir. 1992), where the facts are not in dispute it is a matter of law *Donovan v. Brandel* 736 F.2d 1114 (6th Cir. 1984). Here the facts are in dispute.

The worker's written contract or his intent to contract as an independent contractor is not controlling, since the FLSA ignores such contracts *Imars v. Contractors Mfger*. 165 F.3d 27 (6th Cir. 1998)1998 App. LEXIS 21073, *Robicheaux v. Radcliff*. 697 F.2d 662 (5th Cir. 1983)  "The terms 'independent contractor', 'employee', and 'employer' are not to be construed in their common law senses when used in federal social welfare legislation . . . Rather, their meaning is to be determined in light of the purposes of the legislation in which they were used." In the application of such legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service, *Brandel* 736 F.2d at 1116.

The Sixth Circuit court in *Donovan v. Brandel* utilized a six-factor economic reality test to determine if a worker is an employee: 1) Permanency of the relationship, 2) The degree of skill required, 3) The workers' capital investment, Degree of employers control, 4) Opportunity for profit or loss, 5) Employer's right to control,  6) Integral part of the alleged employer's business.

Mettey worked over three years for American Family. It was not seasonal or of a limited

duration. The Agent Agreement has an intent that the relationship last many years. It was permanent relationship until termination. Permanency strongly favors employee status.

Mettey had sales experience but not with insurance. She had a high school equivalency education, but obtained an insurance sales license. She had training on American Family's computer system, on its sales methods, on its banking procedure, and on its underwriting procedures (Mettey Depos. p 98, 99,104, 110,112, 119, 120). When she joined American Family she had little or no insurance agent's skills. The skill factor favors employee status, somewhat.

Mettey's capital investment was for office furniture, and file cabinets. She leased the computer from American Family. Her first year investment paid for expenses such as rent and her employees wages. Her initial capital investment of $ 4,200 was small. The investment factor is in favor of employee status.

As noted above American Family exercised considerable control over Mettey's insurance sale methods. The other services rendered for American Family such as underwriting, re-inspection and re-computing replacement costs, automobile property claims, banking practice, and policy servicing was controlled by the company's guidelines and computer application programs. Control favors employee status.

Opportunity for profit or loss is governed more by American Family's setting of premium, commission rates and the ACP payments, than by the skill and initiative of a scratch agent. Ohio South sales state has lowest premiums compared to other regions (Begin Depos. p 22). While a lower premium may generate more sales, it also generates much more non-paying work such as servicing of policy holders, underwriting and claims payment. Lack of assistance from the corporate service department created more non-paying service work (Mettey Depos. p 130). Ohio South sales

17

state had lowest ACP compared to other regions (Begin Depos. p 18). American Family's failure to provide a laptop computer with American Family software for life insurance applications seriously restrained Mettey's efforts at selling life insurance (Mettey Depos. p 167). If a larger amount of ACP were paid by the company then staff could be hired. American Family reserved the right to change agent compensation (Agent Agreement §6(d)). American Family could transfer policies from agents who were terminated. American Family could relieve the agent of nonpaying duties, such as collecting medical records and taking saliva samples, paying small auto claims, and home and business re-inspections and re-computations of replacement values. The Sixth Circuit in *Imars v. Contractors Mfger* 1998 App. LEXIS 21073 p.18 found this factor in favor of employee status where the employer controlled the potential profit of the worker. Also see *Usery v. Pilgrim Equip.* 527 F.2d 1308, 1312 (5th Cir. 1976). This factor is in favor of employee status.

Mettey was an integral part of American Family's business. She was an exclusive agent, selling for American Family alone. There were monthly district manager's meetings. Mettey leased a computer that was a part of the American Family Computer network. She was a sales person featured in an American Family video. Besides selling, she performed company functions of underwriting, re-inspection and re-computation of replacement values, servicing current policyholders, and adjusting small auto property claims. She was obligated to make cold calls at the Mason office and work with other American Family agents. During her first four months as an agent she worked at American Family's Mason Office. She paid a fee for inclusion in the American Family advertising and lead programs. This factor is in favor of employee status.

The economic reality is that Mettey was not an independent contractor but an employee.

The exemptions from the FLSA are narrowly construed. The outside sales person or

18

administrative exemption, at 29 U.S.C. § 213(a)(1), may be argued by American Family. On close examination of the Secretary of Labor's regulations[12] and the facts, it is clear neither exemption applies.

Recently the Eleventh Circuit applied the administrative exemption to a class of insurance agents because each had earnings substantially in excess of Allstate's monthly minimum compensation. The Court did not grant summary judgment for the class of agents whose earning were less than the monthly minimum *Hogan et al v. Allstate Ins.* 361 F.3d 621 (11th Cir. 2004). In our matter, Mettey's payments did not exceed the monthly ACP. Mettey had no earnings from American Family when her expenses are considered and when ACP is properly treated as a loan or consideration for a non-compete obligation.[13] The administrative exemption does not apply, under the earlier regulation with her earnings less than $ 250 per week 29 C.F.R. § 541.2(e)(1) or under the current regulation with her earnings under $455 per week. In *Wilshin v. Allstate* 212 F. Supp. 2d 1360 (M.D. Ga. 200) the Georgia district court found an agent within the administrative exemption with earnings above $ 250 per week. But it ignored the earlier regulation, 29 C.F.R. § 541.205(a) which expressly excludes "sales" activities as being administrative operations related to "management policies or general business operations." The current regulation   29 C.F.R. §

---

[12]  Effective April 23, 2004 and August 23, 2004 new regulations on the two exemptions were promulgated. The prior regulations for outside sale person were at 29 C.F.R.§ 541.5, § 541.500 - .507 and for  administrator at 29 C.F.R. § 541.2, § 541.201 - .214. The current regulations are at (29 C.F.R.§ 541.500-541.502)and  29 C.F.R. §541. 201.

[13]  For 3.25 years of services:  new business commissions    $ 24,335
                                                  renewal commissions         $ 36,100
                                                  expense of office               ($79,700)
                                                  ACP $63,500 is a loan  that was forgiven on August 1, 2001, contingent upon non-compete with policy holders for one year.

541.201(a) continues to exclude "selling a product in service establishment" as related to management or general business operations, thus excluding sale of insurance from the administrative exemption. Under the earlier regulation Mettey's activities dealing with claims, policy servicing and underwriting are excluded as clerical work without discretion or judgment by 29 C.F.R. § 541.207(d)(2).

The outside sales exemption was not applied in *Luther v. Z. Wilson*, 528 F. Supp. 1166 (S.D. Oh. W.D. 1981) because there was sufficient evidence that plaintiff spent not less than 20% of her time in managerial activities similar to those of defendant's non-exempt employees 29 C.F.R. § 541.507. Also see *Wirtz v. Atlanta Life Insurance Co.*, 311 F.2d 646,648 (6th Cir. 1963). Mettey's evidence likewise shows that she spent not less than 20% of her time in activities that were nonexempt activities. The current regulations have replaced the not-less-than-20% standard of § 541.507 with "primary duty" of § 541.700.[14]

The outside salesperson exemption does not apply under the current regulations since Mettey's "primary duty" was other than an outside sales person. Mettey was not free of supervision

---

[14] "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."§ 541.700(a)

"...Assistant Managers... may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement." § 541.700(c)

and her compensation for nonexempt work was much less than American Family's inside employees.

Mettey's American Family survey of her 2000 agent activities has 84.5% of her time spent in the office, with 62.5% spent on nonexempt activities that are not incidental to outside sales (Mettey Affid. ¶¶ 3,4,7  survey Exb A, summary of survey Exb. B attached to Affid.).

The current regulation emphasize that the employee must be regularly engaged "away from the employers place of business".  "Any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property" § 541.502. It is clear that Mettey spent the majority of her time (84.5%) in her office or in American Family's Mason Office. Sales were consummated in her office, saliva samples were taken, applications taken, small auto claims paid, policy holders were serviced and data transmitted over the computer.

Damages for FLSA violations of 29 U.S.C. §206, §207 and §216(b) when using the minimum wage and 65 hours of work per week amount to $ 110,846.[15]

---

[15]  **Minimum wage**   2050 hours  1999  totaling      $10,712.00.
                     2050 hours   2000  totaling      $10,712.00.
                     1232 hours   2001  totaling      $ 7,160.
                                                      $ 28,584 min. wage,  29 U.S.C. 206.

   **Overtime:**   25 hrs per week x 52 wks = 1300 hours
               1300 hours      1999          $ 10,042.
               1300 hours      2000          $ 10,042.
                770 hours      2001          $  6,755.
                                             $26,839     Overtime    29 U.S.C. 207.

   **Liquidated damages under** 29 U.S.C. 216(b) = $55,423.

21

*Conclusion*

Defendants' Motion for Summary Judgment must be overruled. There are genuine issues of fact. Clearly Defendant breached the agreement many months prior to Plaintiff's termination. Clearly the FLSA is violated. Under economic realities Plaintiff is a covered employee. The out side sale person and administrative exemptions do not apply.

 /s/ John A. Rebel
John A. Rebel (0031771)
Attorney for Plaintiff
McKinney & Namei
15 E. 8th St.
Cincinnati, Ohio 45202
(513) 721-0200
Fax: 513- 632-5898
jarebel@fuse.net

**Certification of Service**

The undersigned hereby certifies that a copy of the foregoing and of the Supporting Affidavits and copies of pages of depositions were served electronically and by ordinary mail on Douglas Kennedy attorney for Defendants on this    3rd day of December 2004.

 /s/ John A. Rebel
John A. Rebel

## APPENDICES OF EVIDENCE

Plaintiff's Affidavit Contra  to Summary Judgment    8 pages
       Exhibits attached to Plaintiff's Affidavit
              Exhibit A......American Family Activities Survey for Mettey
              Exhibit B......Summary of American Family Activities Survey
              Exhibit C...... e-mail *Soaring Eagles* 4/30/01 to Mettey
              Exhibit D......District 232 Marketing Plan
              Exhibit E...... Agenda District 232 Meeting January 2001
              Exhibit F...... Agenda District 232 Meeting February 2001
              Exhibit G......Agenda District 232 Meeting March 2001
              Exhibit H......Agenda District 232 Meeting April 2001
              Exhibit I...... Agenda District 232 Meeting May 2001
              Exhibit J......
              Exhibit K......Handwritten notes on policy mix
              Exhibit L...... Robinson letter dated Jan. 8, 2001
              Exhibit M......Robinson letter dated May 10, 2001
              Exhibit N..... Toureen letter dated May 14, 1998
              Exhibit O...... Robinson handwritten list

Kevin Begin Deposition Excerpts (3/3/04), Exhibits same as Toureen's Depostion.

Kendall Toureen Deposition Exhibits (Deposition attached to Defendants' Motion)
              Exhibit 2 .... Toureen letter dated May 14, 1998
              Exhibit 3 .... Mettey's Budget used to compute ACP
              Exhibit 5 .... Form letter from American Family 5/27/98

Richard Robinson Deposition Excerpts

Ronda Mettey Deposition attached to Defendants' Motion.

Cassandra Stiff Deposition attached to Defendants' Motion.

Deb Harp Deposition attached to Defendants' Motion.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Ronda A. Mettey | : | |
| | : | |
| Plaintiff, | : | **CASE No.   C-1-02 398** |
| vs. | : | |
| | : | Judge Spiegel |
| American Family Mutual Insurance | : | |
| Company,  et al | : | Magistrate Black |
| | : | |
| Defendants. | : | **PLAINTIFF'S AFFIDAVIT CONTRA** |
| | : | **TO DEFENDANTS' MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| | : | |

*State of Ohio  }        County of Hamilton  }ss:*

Being duly cautioned that penalties for perjury could apply to this affidavit and being duly

sworn, the undersigned Ronda A. Mettey states the following to be true to her personal knowledge.

1.      For 1999 I averaged sales of about 30 new policies per month. During 2000 I averaged about

24 per month and during the first half of 2001 I averaged 20 new policies per month.  During June

2000 my office was flooded. While it was rebuilt, I had no office for several  months. Consequently

my 2000 new application (policy) rate fell from 35 policies per month to 20 per month. I could not

afford a staff person during the latter part of 2000. During November 2000 my ACP was increased

from $2,500 to $ 3,000 per month.  About December 1, 2000, my first district manager Ken Toureen

resigned.

2.      During December 2000 my new District Manager, Richard Robinson for the first time set

production levels for my agency. He stated to me that I "will meet or not stay in business and have

an agency" Since many agents had been forced to resign during 2000, I felt that I was being forced

out. Consequently, my enthusiasm decreased.

1

3.      During early 2001 American Family conducted an agent survey.  Results were published and provided to me  during April 2001. It was also provided  through discovery. Attached as Exhibit A are my survey results. Attached as Exhibit B is a summary of my results, which show that my in-office activities took 84.5% of my work time, and that my non-sale work or and non-incidental sal work amounted to 62.5% of my time.

4.      My survey responses are accurate. For example the entry for 1.4 Meetings is 4%, the district meetings including travel to Mason, Ohio took a full day of my time each month, plus the state meeting clearly took 4 or 5 % of my total time. Each heading of the survey has numerous specific tasks.

5.      My capital investment was for a desks, chairs, table, copier, camera, and a filing cabinet. It amounted to about $ 4,200. During the first year I spent a total of $ 15,000 of my savings on office operating expenses.

6.       I was not free of supervision by American Family at any time, and my compensation for t work not exempted from the Fair Labor Standards Act was much less than American Family's inside employees.

7.      Eighty-four and one-half percent  (84.5%) of my work week was spent in my office or in American Family's Mason Office. At my office, telemarketing occurred, sales were consummated, applications taken, saliva samples were taken, medical, driver's and credit records were ordered, small auto claims paid, policy holders were serviced, properties were re-evaluated and data transmitted over the computer system.

8.      During  my 3.25 years of services to American Family, I received: new business commissions of   $ 24,335. The renewal commissions of $ 36,100 were deducted from the ACP

which equaled $ 99,600, so that I received a net ACP of $63,500. Money owed American Family

for the computer lease, leads and advertisements were also deducted. My total office expense was

$79,700. I was not compensated for the value of the 485 policies that would generate future

premiums and commissions.

9.      The net ACP of $63,500 is a loan that was forgiven on August 1, 2001, contingent upon my

not trying to sell my policy holders insurance for one year. Net ACP $ 63,500 plus new business

commissions $ 24,335 less expenses $ 79,700 yields a net income of $8,135 for three years of

employment. I had an average annual income of $ 2,503 or $ 48 weekly. If the new business

commission is treated as the earnings then the average annual income is $ 7,487, or $144.00 per

week for a 60 plus hour work week. This is less than the amount paid by American Family to its

clerical employees.

10.     I was an exclusive agent, selling for American Family alone. There were monthly district

manager's meetings. I leased a computer that was a part of the American Family Computer network.

I was one of the sales people featured in an American Family video. Besides selling, I performed

company functions of underwriting, re-inspecting properties and re-computing the replacement cost

of property after the insurance issued, servicing current policyholders, assisting the policy holder

with claims and paying small auto property claims. During 2000, I was directed to re-compute all

the replacement costs of all the properties insured using the new ITV program. I was directed to

make cold calls at the Mason office. During my first four months as an agent I worked out of

American Family's Mason Office. I paid a fee for inclusion in the American Family advertising and

leads program.

11.     My plan was to have a profitable business by building a client base that would remain with

3

me. I did not plan to sell a large volume of high risk automobile insurance. While this might give me a high production rate, it would not build a stable client base for return business.

12.     Cassandra Stiff, (hereinafter referred to as "Stiff") was in the habit of dictating what she wanted the agents to do. At the state meetings she would repeatedly state "I want the agents" to do numerous specific task. The sales director was the supervisor of the district managers who were employees of American Family. She required that the agents work on Saturday morning. I had been in the habit of working Saturdays anyway. During 2000 about one hundred agents left the Ohio South Sales State. Most were asked to resign.

13.     Attached hereto, as Exhibit C, is a copy of the e- mail regarding the *Soaring Eagles* training program, that I received.. The e-mail notes that the meetings are not elective. Richard Robinson told me that I had to attend the *Soaring Eagles* sessions. To me this meant that they were mandatory. Attached hereto, as Exhibit D,  is a copy of the 232 Marketing Plan, that I received in December 2000. It has specific tasks that I was supposed to perform I specific times of the day for each day of week. This was physical control of the manner in which my agency was to operate.   I objected to this plan and was told by Robinson "Agents are like infants. They don't know what they need." Robinson did not like my office and wanted me to have a store front.

14.     Attached hereto, as Exhibits E, F, G, H, I,  are agendas for monthly district 232  meetings. Many refer to the Marketing Plan. At each meeting it was stressed that we had to comply with the Marketing Plan. The agendas also showed the mandatory nature of the bi-weekly cold calling sessions at the American Family Mason office. These Exhibits were provided through discovery and are copies that I received at each given meeting.

15.     My staff person was injured during November 2000. I had no assistant for several months.

4

The January agenda (Exhibit E) shows that the agents were given 90 days to have staff. This pressured me into hiring someone. Shortly after the hiring, the District Manager, Richard Robinson, came to my office. He instructed me on how the office telephone should be answered. He was so involved with telling the assistant how do her job, that she was ready to quit at the end of the day. Several agendas have notations of answering the telephone and dress. He was dictating how to answer the phones at the district meetings. During May 2001 I let the employee go because of a conflict of interest and did not replace her.

16.    Call nights were at the Mason Office for two or three hours. Agents who were struggling were required to attend. I was instructed to attend during 2001, but did not, since the drive to Mason was time consuming. I was pressured into buying leads from the American Family at about $40 to $ 100 per month. My cold calls were generally made from my office by my assistant or me. For 120 dials I might get 2 appointments.

17.    My 2000 American Family Survey, at *6.1 Reinspection*, (Exhibit A & B) shows time spent after the sale of a policy. The Corporate office would contacted me requiring a reinspection of a home or business of a policy holder, to see if a repair had been made or a potential liability removed. Also requested would be ITV's which would be a recalculation of the cost to rebuild a home or business. A five page computer routine would need a data input. Much underwriting re-inspections were done as required by the Underwriting Office after the policy was in force. Also much time was spent in re-doing the cost of replacements of property under policies in force, when the company implemented the ITV computer system.

18.    The American Family's ADS computer system would tell me to do certain tasks for an existing policy holder; for example, to call when a child turned 16 years, to see if a driver needed

to be added to a policy.

19.    At the February 2001 agenda (Exhibit F) of the district meeting, the agents were encouraged to join the PIR (personal insurance review) telemarketing program, where a company employee would call the policy holders of the agency. Personal questions on finances, health etc would be asked to determine insurance needs. I did not join, since my policy holders might feel offended by such a call from a stranger.  We were also told at this meeting to be more involved in the claims process (as noted in the agenda). I resisted this as more nonpaying work not connected with sales. All the 2001 agendas dealt with the requirement of following the 232 Marketing Plan (The agenda's Are we all following it???). The cold calling night was scheduled. I was pressured to attend but did not.

20.    At the March 2001 agenda (Exhibit G) and district meeting the agents were encouraged to enroll in the Realtor Expo, which I did. Richard Robinson dictated to the agents that we should see homes in the morning for the underwriting of homeowner's insurance.

21.    The April agenda (Exhibit H) and meeting again dealt with following the 232 Marketing Plan, also the Saturday morning cold calling session at the Mason Office was mandatory: "**No excuses or EXCEPTIONS**". The agendas show that the agents were required to set up policies with two payment methods **ONLY**. While the company in theory had four methods of premium payment we were instructed to only use two methods, to enhance retention. Under Training: at "Q" appears "Audit, use digital camera ex. Renewal Notices which references re-inspections. The underwriting upon audited a policy would immediately demand transmission of digital photographs of the home or business. At renewal of a policy the home or business had to be re-photographed and the cost of replacement of the property had to be recalculated using the ITV program. During the first Each

6

agenda listed the special events we were to attend. On 5/19/01 I had a prior commitment to attend my niece's dance recital. I told Richard Robinson, he stated that attendance was "mandatory." I went to the American Family event.

22.    In May's agenda (Exhibit I) and meeting,  it was again  mandated that the payment of life premiums be only by AFT (automatic account transfer) or paid annually. The May and June meeting had mandates on telephone answering,  following the Marketing Plan and Saturday hours.

23.    Richard Robinson requested that I allow another agent to share my office. I refused.

24.    The true reason for my termination was not production, my numbers were average or just above average. The top few agents might be selling the numbers that were demanded of me. I was terminated because I objected to being treated as an employee, rather than an independent contractor.

25.    I lost moneys expended on my office expenses of $75,000, and lost my service time to American Family, in excess of sixty hours per week, for over three years, which is valued at $ 200,000.00.  I obligated myself to not compete for one year which is valued at $50,000. The time and money were expended in reliance on American Family's promise that I would be an independent contractor. These losses were caused by American Family's breach of this promise. On or about August 1, 2001, I received a letter from American Family stating that if I contacted any of my clients for purposes of selling insurance during following  year, I would be obligated to repay the ACP balance.

26.    The value of my client base and the goodwill that I created for the company greatly exceeded the amount due on the Advance Compensation payments.

27.    The time spent working to serve American Family was at least 65 hours per week during the

3.25 years. This includes time spent at special events and state meetings. I worked six days or more per week. From Monday through Friday I averaged over 11 hours per day.

28.    After receiving the 232 Marketing Plan (Exhibit D) and the January letter threatening termination of the agency unless I sold 40 new policies each month, I ask the district manager what would the mix of policies be. My handwritten notes recorded Richard Robinson's response as to the number and type of policy to be sold. The handwritten notes are attached hereto as Exhibit K and referred to in several depositions. Exhibits C, D and K were identified and discussed in several depositions in this matter.

29.    Attached as Exhibits L and M are copies of correspondence from Richard Robinson dated January 8, 2001 and May 10, 2001 that I received. Attached as Exhibit N is the May14, 1998 Expectation letter from Ken Toureen. They have been identified and discussed in depositions in this matter.

30.    After my termination there was a meeting with Cassandra Stiff and Richard Robinson. I wanted to know the reason for termination. Cassandra had a hand written list (attached hereto as Exhibit O) from Robinson that included: "not following the Managers Directions" and my complaints about not following Robinson's claim system.

_____
Ronda A. Mettey

Sworn to and before me on this 1st day of December 2004 and signed in my presence by Ronda A. Mettey who is personally known to me.

_____
Notary

JOHN A. REBEL, Attorney at Law
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration
date, Section 147.03 O.R.C.


AMERICAN FAMILY
INSURANCE
*AUTO HOME BUSINESS HEALTH LIFE*

# Activity Analysis Survey Summary of Results

Comparison of Individual Responses to Responses from all Agents

Agent-District code: 004232  at RMETTEY@AMFAM.COM

Section I:     General Respondent Information

| | Position | All Agents (mean) | Your Response |
|---|---|---|---|
| How many full-time equivalent staff (FTEs) work in your agency? (Where full-time staff = 1.0 FTE, half-time staff = 0.5, etc.) | Agent/Agency Principal | .1 | NA |
| | Licensed Producer/Customer Service Rep | 1 | NA |
| | Unlicensed Customer Service Rep | .65 | NA |
| | Admin. Support/Clerical | .52 | 0.5 |

| | Geography | All Agents (%) | Your Response |
|---|---|---|---|
| How would you characterize the geographic region where your agency conducts most of its business? | Rural | 28% | |
| | Suburban | 42% | Suburban |
| | Urban | 27% | |
| | No response | 2% | |

| | Source of 2000 Sales | All Agents (mean) | Your Response |
|---|---|---|---|
| Of the policies your agency put on its books in 2000, approximately what percentage came from sales to new customers from *prospecting*, new customers from *referrals*, and new sales to *existing* customers? Please exclude transfers from other agencies. | Prospecting | 28% | 60% |
| | Referrals | 31% | 30% |
| | Existing Customers | 43% | 10% |

Section II:   Summary of Agency Activities

Directions: Please allocate the amount of time you spend over the course of a year among the six Activity Categories listed below. (It may be helpful to consider your activities during an "average" week or month.) **Please use whole percentages from 1 to 100.** If you do not spend time in one of the areas, please enter a "0." The sum of your total time among all six areas should be 100. Next, rank the categories from one to six in terms of their importance to your agency's sales and customer retention results (1 = the most important activity).

| Activity Category | % of Time you spend on this activity over a year | | Importance Rank (1-6) 1=Most Important 6=Least Important | | | |
|---|---|---|---|---|---|---|
| | | | Sales | | Retention | |
| | All Agents (mean) | Your Response | All Agents (median) | Your Response | All Agents (median) | Your Response |
| 1. Agency Planning, Management and Administration Represents all activities associated with managing your agency as a business, including: business planning, business management, people management and meetings | 11% | 10% | 4 | 5 | 4 | 6 |

**PLAINTIFF'S AFFIDAVIT**

**EXHIBIT A**

1

| Activity Category | % of Time you spend on this activity over a year | | Importance Rank (1-6) 1=Most Important 6=Least Important | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Sales | | Retention | |
| | All Agents (mean) | Your Response | All Agents (median) | Your Response | All Agents (median) | Your Response |
| 2. Marketing and Sales Prospecting/New Business Development Represents all activities associated with creating sales opportunities for your agency including: development of/follow-up on leads (new prospects and existing customers), marketing/sales materials design/development/management, planning/management of active marketing programs, advertising and local promotion and community involvement/networking | 18% | 20% | 2 | | 3 | |
| 3. Acquisition and Sales Represents all activities associated with acquiring and putting new business onto the books, including: responding to sales inquiries, customer profiling/quoting (in-office, out-of-office), closing sales and underwriting (including initial property inspections), policy issuance/fulfillment and filing | 23% | 20% | 2 | | 3 | |
| 4. Customer Service Represents all activities associated with servicing existing customers, including: billing/premium collection, billing problem resolution, claims handling/coordination, policy changes/endorsements, policy coverage questions/requests | 28% | 40% | 3 | | 1 | |
| 5. Customer Relationship Management Represents all activities associated with customer development through non-sales/service-specific activities, including: formal relationship management programs and policy retention activities | 10% | 5% | 3 | | 2 | |
| 6. Profitability Management Represents all activities associated with managing/retaining profitable customers on your books, including: reinspection of properties, and customer profitability management | 10% | 5% | 4 | | 3 | |
| Total: | 100% | | | | | |

## Detailed Activity Analysis

Directions: If you indicated that you spend time on this Activity Category in Section II, please break that time down into the Activity Groups below. The time you allocate should equal 100%. As with Section II, average your allocation over a period of *one year*, though you may want to consider an "average" week or month to make it easier to allocate your time. Next, for those Activity Groups that you spend time on, rank order the *three (3)* most important activities that contribute to agency sales and retention results. (1 = the most important activity)

## 1. Agency Planning, Management and Administration

| Activity Groups within Agency Planning, Management and Administration | % of Time you spend on this activity over a year | | Importance Rank (1-3) 1=Most Important | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Sales | | Retention | |
| | All Agents (mean) | Your Response | All Agents (median) | Your Response | All Agents (median) | Your Response |

2

| Activity Groups within Agency Planning, Management and Administration | % of Time you spend on this activity over a year | | Importance Rank (1-3) 1=Most Important | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | All Agents (mean) | Your Response | Sales | | Retention | |
| | | | All Agents (median) | Your Response | All Agents (median) | Your Response |
| 1.1. Business Planning: Including development of agency strategies, financial/production goals and business plan, development of marketing plan; establish and analyze goals, managing vendors and suppliers, completing American Family planning-related surveys/questionnaires | 20% | 10% | 2 | 1 | 2 | NA |
| 1.2. Business Management: Review agent daily update tickets, account statement reconciliation, completion of reports for American Family (e.g. ACP production reports), payroll, bookkeeping, tax preparation and filing; general office file management, production/performance tracking, commission reconciliation, incentive plan administration, reading American Family updates and communications, infrastructure/facility/technology management, compliance (e.g., licenses, contracts/appointments) | 45% | 40% | 2 | NA | 2 | 1 |
| 1.3. People Management: Including hiring (e.g., creation of job descriptions, job posting/advertising), firing, training and development for self and staff (e.g., continuing education, product knowledge, sales effectiveness, business and management, computer/automation training), performance and compensation management (for agency staff) | 20% | 10% | 2 | 3 | 2 | 2 |
| 1.4. Meetings: Including district, state, regional, corporate, staff and ACP agent meetings/functions (including travel); record keeping and file maintenance for meetings/functions | 15% | 40% | 3 | 3 | 3 | NA |
| | 100% | | | | | |

2. Marketing and Sales Prospecting, New Business Development

| Activity Groups within Marketing and Sales Prospecting, New Business Development | % of Time you spend on this activity over a year | | Importance Rank (1-3) 1=Most Important | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | All Agents (mean) | Your Response | Sales | | Retention | |
| | | | All Agents (median) | Your Response | All Agents (median) | Your Response |
| 2.1. Development of/Follow-up on Leads (New Prospects Only): Including tracking lead sources, conducting meetings with prospective customers, conducting initial needs analysis, scheduling appointments, providing guidance to prospective clients, tracking referrals, record-keeping and file maintenance for sales prospecting | 27% | 30% | 1 | 2 | 2 | 3 |
| 2.2. Development of/Follow-up on Leads (Existing Customers Only) i.e., up-selling and cross-selling: Including calling current customers for new business, tracking lead sources, conducting meetings with existing customers, setting-up/conducting/following-up on PIRs and annual reviews, scheduling/conducting appointments, providing needs analysis/guidance to existing clients, tracking referrals, mailing brochures of uncovered policies, record keeping and file maintenance for existing customer prospecting | 35% | 30% | 1 | 2 | 1 | |

| Activity Groups within Marketing and Sales Prospecting, New Business Development | % of Time you spend on this activity over a year | | Importance Rank (1-3) 1=Most Important | | | |
|---|---|---|---|---|---|---|
| | All Agents (mean) | Your Response | Sales | | Retention | |
| | | | All Agents (median) | Your Response | All Agents (median) | Your Response |
| 2.3. Planning and Management of Active Marketing Programs: Including planning, management and administration of marketing programs such as telemarketing, direct mail, e-mailing, referral programs; tracking program results | 11% | 10% | 3 | 3 | 3 | NA |
| 2.4. Advertising and Local Promotion: Including development and placement of advertisements, development and management of local sponsorships (e.g., sponsoring a little league team), tracking/evaluating effectiveness of advertisements/sponsorships | 7% | 10% | 2 | NA | 2 | NA |
| 2.5. Marketing/Sales Material Design, Development and Management: Including developing direct mail materials, product description brochures, marketing sales material reviews | 6% | 10% | 2 | 3 | 3 | NA |
| 2.6. Community Involvement/Networking: Including networking through centers of influence (e.g., banks, auto-dealers, mortgage brokers), network groups, and participating in community events | 14% | 10% | 2 | 2 | 2 | NA |
| | 100% | | | | | |

3. Acquisition and Sales

| Activity Groups within Acquisition and Sales | % of Time you spend on this activity over a year | | Importance Rank (1-3) 1=Most Important | | | |
|---|---|---|---|---|---|---|
| | All Agents (mean) | Your Response | Sales | | Retention | |
| | | | All Agents (median) | Your Response | All Agents (median) | Your Response |
| 3.1. Customer Profiling/Quoting: (telephone, in-office appointments, Internet e.g., amfam.com, INSWEB, Netquote) Including answering general sales inquiries, obtaining relevant information from customer, entering information into quoting systems (e.g., ADS, AMFLP 2000) to generate quotes, manually calculating quotes, discussions with American Family's underwriters, reviewing requests for quotes, e-mailing or calling the prospect with the quote | 34% | 10% | 1 | 2 | 2 | |
| 3.2. Customer Profiling/Quoting (out-of-office): Including answering general sales inquiries, obtaining relevant information from customer, entering information into quoting systems (e.g., ADS, AMFLP 2000) to generate quotes, manually calculating quotes, discussions with American Family's underwriters | 17% | 15% | 2 | 2 | 2 | NA |

4

| Activity Groups within **Customer Service** | % of Time you spend on this activity over a year | | Importance Rank (1-3) 1=Most Important | | | |
|---|---|---|---|---|---|---|
| | All Agents (mean) | Your Response | Sales | | Retention | |
| | | | All Agents (median) | Your Response | All Agents (median) | Your Response |
| **4.3. Claims Handling and Coordination:** Including answering customer questions (coverage, deductible, claims process, etc.), receiving and reporting claims to American Family, scheduling service for loss damages, Qwik Pay, updating records on subrogation, checking on claim status, correspond with claim adjusters/client/American Family Claim Call Center to facilitate/accelerate claims processing, providing follow-up contact after claim, record keeping and file maintenance for claims | 19% | 20% | 2 | NA | 1 | 2 |
| **4.4. Policy Changes/Endorsement:** Including receiving change request information from customer, entering change/endorsement information into system(s) (e.g., adding vehicles), submitting E-forms, communicating/following-up with service team, reviewing policy for errors and making corrections (verify changes were done properly), delivering changes/endorsement documents (mail and personal delivery), re-underwriting (make changes to risk profile), responding to change requests for AFT, record keeping and file maintenance for policy changes/endorsements | 19% | 20% | 2 | NA | 2 | 2 |
| **4.5. Policy Coverage Questions/Requests:** Including questions about renewal dates, coverages, requests for proof of insurance | 13% | 10% | 2 | NA | 2 | 3 |
| **4.6. Other Customer Service:** Including assisting insureds with acquiring life loans/dividend withdrawals, contacting mortgage companies, dealerships, lenders, appraisers, answer questions from American Family, answering other customer questions | 13% | 10% | 2 | NA | 2 | NA |
| | 100% | | | | | |

## 5. Customer Relationship Management

| Activity Groups within **Customer Relationship Management** | % of Time you spend on this activity over a year | | Importance Rank (1-2) 1=Most Important | | | |
|---|---|---|---|---|---|---|
| | All Agents (mean) | Your Response | Sales | | Retention | |
| | | | All Agents (median) | Your Response | All Agents (median) | Your Response |
| **5.1. Formal Relationship Management Programs:** Including mailings, sending gifts (e.g., calendars), thank-you cards, birthday cards, lunches, call-backs, existing customer file review/queries, public relations with existing customers, providing client with policy information, assisting insureds with completing audit forms, acting as a confident/provide support (e.g., after loss), initiating safety reviews, record keeping and file maintenance for policy retention | 61% | 50% | 1 | NA | 1 | 2 |
| **5.2. Policy Retention:** Including following-up on late payment and lapsed policy notifications, contacting customer near renewal date, responding to customer requests for cancellation | 39% | 50% | 2 | NA | 1 | 2 |
| | 100% | | | | | |

## 6. Profitability Management

| Activity Groups within Profitability Management | % of Time you spend on this activity over a year | | Importance Rank (1-2) 1=Most Important | | | |
|---|---|---|---|---|---|---|
| | | | Sales | | Retention | |
| | All Agents (mean) | Your Response | All Agents (median) | Your Response | All Agents (median) | Your Response |
| **6.1. Reinspection of Properties:** Including management of on-site visits, documenting changes/alterations, time spent on inspections, ITV program execution/management (answering customer questions, filling out forms, inspecting property) | 53% | 75% | 2 | NA | 1 | NA |
| **6.2. Customer Profitability Management:** Including reviewing accounts for desirability (at loss, new driver, new MVR etc.), reviewing claim loss reports, inspecting risk, reviewing cancellation/expiration information, managing rate increases, managing proactive customer terminations, seeking underwriting reviews of suspect accounts | 47% | 25% | 2 | NA | 1 | 8 |
| | 100% | | | | | |

**Ronda Mettey Survey of Time Spent in Activities for year 2000**
Survey taken in early 2001, results published April 2001

| Activity | Activity % of Total | Subactivity % Activity | Subactivity % Total | In Office | Non Exempt |
|---|---|---|---|---|---|
| 1. Agency Plan/Management | 10% | | | | |
| 1.1 Business Planning | | 10% | 1% | 1% | 1% |
| 1.2 Business Management | | 40 | 4 | 4 | 4 |
| 1.3 People Management | | 10 | 1 | 1 | 1 |
| 1.4 Meetings | | 40 | 4 | 4 | 4 |
| | | | | | |
| 2. Marketing Sales Prospectg | 20% | | | | |
| 2.1 Initial Lead Contact | | 30% | 6 | 6 | |
| 2.2 Calling Upkeep Record | | 30 | 6 | 6 | |
| 2.3 Plan Manage Active Telemarket, Mail | | 10 | 2 | 2 | |
| 2.4 Ads Promo. | | 10 | 2 | 2 | |
| 2.5 Develope direct mail | | 10 | 2 | 2 | |
| 2.6 Community network | | 10 | 2 | | |
| | | | | | |
| 3. Acquisition & Sales | 20% | | | | |
| 3.1 In Office Telephone Internet, Aptmt. | | 10% | 2 | 2 | |
| 3.2 Out of Office Quoting | | 15 | 3 | | |
| 3.3 Closing& Underwriting | | 35 | 7 | 2 | |
| 3.4 Policy Issuance | | 30 | 6 | 6 | 4 |
| 3.5 Filing | | 10 | 2 | 2 | 2 |
| | | | | | |
| 4. Customer Service | 40% | | | | |
| 4.1 Billing Banking | | 30 | 12 | 12 | 6 |
| 4.2 Billing Problems | | 10 | 4 | 4 | 4 |
| 4.3 Claims | | 20 | 8 | 8 | 8 |
| 4.4 Policy Changes | | 20 | 8 | 8 | 8 |
| 4.5 Coverage Questions | | 10 | 4 | 4 | 4 |
| 4.6 Other customer service | | 10 | 4 | 4 | 4 |
| | | | | | |
| 5. Customer Relationship Management | 10% | | | | |
| 5.1 Formal Relation.Mang | | 50 | 5 | 5 | 5 |
| 5.2 Policy Retention | | 50 | 5 | 5 | |
| | | | | | |
| 6. Profitability Management | 10% | | | | |
| 6.1ReInspection | | 75 | 7.5 | | 7.5 |
| 6.2 Customer Profile Management | | 25 | 2.5 | 2.5 | —— |
| | | | | 84.5% | 62.5% |

**Total Time in Office**          **84.5%**

**Total Time in Non Exempt Activities   62.5%**

**PLAINTIFF'S  AFFIDAVIT**

**EXHIBIT B**

4/30/01

**Ronda Mettey**

---

**From:**   Denny, Maureen X <MDENNY@amfam.com>
**To:**     Newel, Ben E <BNEWELL@amfam.com>; Heath, Chad X <CHEATH@amfam.com>; Francis,
            Christopher T <CFRANCIS@amfam.com>; Mccullars, Cynthia L <CMCCULLA@amfam.com>;
            Molulon, Dickson K <DMOLULON@amfam.com>; Hill, Ellen C <EHIL2@amfam.com>; Boyd, Gail
            M <GBOYD@amfam.com>; Finn, Gordon M <gfinn@amfam.com>; Gibson, Janice L
            <JGIBSON@amfam.com>; Santoro, Judy A <JSANTORO@amfam.com>; Lashelle, Karen A
            <KLASHELL@amfam.com>; Terry-Baker, Kathleen M <KTERRY@amfam.com>; Mulrooney, Mari
            A <MMULROON@amfam.com>; Williams, Pat M <PWILLIA2@amfam.com>; Mettey, Ronda A
            <RMETTEY@amfam.com>; King, Rod A <RKIN3@amfam.com>; Smith, Shelley E
            <SSM21@amfam.com>; Gheen, Tom D <TGHEEN@amfam.com>
**Cc:**     Rabas, Andrew <arabas@amfam.com>; Merriewether, M B <mmerriew@amfam.com>; Green,
            Cindy A <CGREE1@amfam.com>; England, Jody <JENGLAND@amfam.com>; Begin, Kevin J
            <kbegin@amfam.com>; Robinson, Richard D <rrobins2@amfam.com>; Kerns, Rob
            <rkern1@amfam.com>; Sowder, Ronald W <rsowder@amfam.com>
**Sent:**   Monday, April 30, 2001 3:50 PM
**Subject:** Soaring Eagles Reports from Last Week!

Good Afternoon all you hard working agents!!!

What a great Monday we have going. The sun is shining -
and hopefully the air conditioner is working.

Last week we had some Commercial Lines Writers:
MariAnn Mulrooney      3 applications
Ellen Hill             1 application
Shelly Smith           1 application
Chris Francis          1 application.

Congratulations to you!!! It is great to see all of your hard work paying off!!

Now the bad stuff -
If you have not sent me your tracking sheet - please do so ASAP.

The Soaring Eagles classes are designed to help you get your
production going. We are working on a few pieces of the
puzzle that you may not have heard before. The Life Sales
Track is an essential part of your training. A well presented
sales track will be invaluable to you as you continue the road
to being a successful agent. Work on this. It will prove itself
over and over again if you use it consistently.

The Classes are being presented to help you be a great
agent. **They are not elective.** They **MUST** take first
priority in your planner. This block of time should be set
aside and nothing should interfere with your attendance for the
entire session. If you have questions or concerns
about this - please call me or talk with your District Manager.
We are all here to do what we can to help you.

As I expressed in our last meeting, we will be scheduling a time for
you, your district manager and I to meet. This will be scheduled
in June. At that time, we will discuss your progress this year and what
we plan on seeing from you in the future. Of course, your Life Plan will
be covered.

I will be in touch with you in the near future once the

**PLAINTIFF'S AFFIDAVIT**          17      05/01/01

**EXHIBIT C**

# DISTRICT 232 - MARKETING PLAN

## Monday

- Drop flyers into targeted residential area (utilizing the reverse directory at the library) from 8:30 am - 10:00 am (approx. 150 homes). Follow up with them on Tuesday between 5 - 7 pm
- Select 16 Dry Cleaners nearest your office (stop by 4 of the 16 Dry Cleaners 10:30 am - 11:30am - Build rapport and leave business cards in a stand and restock the stand with business cards every 2 - 3 weeks
- 2 - 4 pm paper processing
- Reserve and schedule Life Insurance from 4 - 8 pm - If no appointments are set at this time, then utilize this time frame to **exclusively prospect Life Insurance** (Statewide Data Leads)

## Tuesday

- Drop flyers into targeted apartment building from 8:30 - 10:00 am (approx. 100)
- Work on developing relationships with "centers of influences" (send letter of introduction today and call them back on Friday - 9:45 - 10:45 am
- Call homes where flyers were dropped on Monday 5 - 7 pm, follow up on leads from Statewide data or company mailing program 7 - 9 pm
- Call American Family and enroll in lead program and follow up with call 7 - 9 pm

## Wednesday

*ATTEND DISTRICT MEETINGS*

- Visit 5 commercial lines businesses and get dec pages or X-dates from 9 - 10:30 am
- Select 16 Mortgage offices near your office - stop by 4 of the 16 offices 11:30 am - 1:00 pm - each following week, rotate to the next set of 4 mortgage offices, etc. build rapport, offer assistance for their insurance processes and lead them to understand that you can service them and their clients in a professional, expeditious, and through manneri Ask them for the opportunity to do business
- 2 - 4 pm paper processing
- Cold call 5 - 7 pm and follow up on leads from Statewide data and/or company leads

## Thursday

- Target Nursing homes, long-term care leads and find 1 person to talk to about Long Term Care Insurance from 8:30 - 10:00am
- Target one type of business line (ex hair salons) and then locate those business in the yellow pages and focus on them from 11:00 am - 12:30 pm
- Talk to one ~~business~~ about health insurance 3 - 4 pm

## Friday

*FAX REPORTS TO RR by 10:30 am*

- Call on centers of influences and distribute donuts, etc. from 8:30 - 9:30 am
- follow up on letters sent to centers 9:45 - 10:45 am
- Select 4 - 6 car dealerships (close together) - stop there between 11:45 - 1:45 pm (shake hands, build rapport, give them a laminated business card, a magnetic business card and 4 additional business cards on your first visit. Thereafter, additional gift items at will (i.e. thermal mug, etc..) - give them a "gold dollar coin" for every referral and a thank your card
- 2 - 4 pm paper processing

## Saturday

- Life Insurance and other insurance, by appointment only
- Be available (open) to potential clients
- Make sure your cell phone is on and all centers have your number
- Finalize the week, close any loose ends, and plan for the upcoming week

**PLAINTIFF'S AFFIDAVIT**

**EXHIBIT D**

**District 232 Monthly Meeting**
January 17, 2001

**"If you risk nothing, you risk everything!"**

**Richard D. Robinson, District Manager**

**Guest: Mike Mutterspaugh - Life Specialist**

## *Agenda*

I.   **Production**

    A.   Monthly production (District 232)
    B.   New business commission
    C.   AFLIC
    D.   All-American
    E.   Commercial lines
    F.   Fast Start Campaign - Bonus Days Golden Bonanza
    G.   Contest - Life app give-away

II.  **Mike Mutterspaugh - Life Insurance Sales Techniques**

III. **PowerPoint Slide on Retention**

IV.  **Power Position Your Agency: A Guide to Agency Success**

V.   **Training**

    A.   Home-Owners with Advantage / Auto
    B.   Auto-Home-Life Packages
    C.   5 C's
    D.   New "Life Needs Analysis" brochure
    E.   BNI Networking
    F.   State-wide Data
    G.   Cold calling - Monday and Tuesday nights - State Office

**PLAINTIFF'S AFFIDAVIT**

**EXHIBIT E**

H.    All Home-Owners applications need photo
I.    Apps entered no longer than 5 days after written
J.    Churning - Use old policy number

**VI.  Dressing for Success**

**VII. Office Staff**

A.    90 days

**VIII. File Check-list**

**IX.  Agent Directory**

**X.   Direct Marketing Partnership**

**XI.  Marketing Plan**

A.    Criss-Cross directory
B.    Weekly Activity report

**XII. Business Plan**

**XIII. Agent Referrals**

**XIV. Credit Program**

A.    CCCS

**XV.  Claims**

A.    Online claim report - Auto

**XVI. Special Events**

A.    Life Training - Saturday, January 20, 2001 - State Office
B.    Ohio South Award Luncheon - Friday, April 20, 2001 - State Office

**District 232 Monthly Meeting**
February 14, 2001

"I've got a theory that if you give 100 percent all of the time, somehow things will
work out in the end."
*Larry Bird*

**Richard D. Robinson, District Manager**

**Guest: Roman Tkach - Loan Specialist**

## *Agenda*

I.   **Production**

    A.    Monthly production (District 232)
    B.    New business commission
    C.    AFLIC
    D.    All-American
    E.    Commercial lines
    F.    Cruisin For Apps in '01!

II.   **Roman Tkach - Loan Sales Techniques**

III.   **ABCD Transition to Life Insurance**

IV.   **Power Position Your Agency: A Guide to Agency Success**

    "Chris Best" - pages 3 - 28

V.   **Training**

    A.    Same coverage on all policies
    B.    Agenda selling systems
    C.    Life Sales - All parties are present

**PLAINTIFF'S  AFFIDAVIT**

**EXHIBIT F**

      D.     Life Insurance **Sign-Off**
      E.     Audit form (Good Student letter, proof of prior insurance, etc.)
      F.     Variable Products
      G.    Med Sup Plans
      H.    Health issued All-American points
      I.     Focus on profit

**I.**    **Marketing Plan**

      A.    Are we all following it????
      B.    Cold calling - Monday and Wednesday nights - State Office

**I.**    **Agent Automation Agreement**

      A.    Needs to be completed today

**II.**   **Enroll in the PIR Telemarketing Program**

**III.**  **Life Apps Sent in By 2/16/01 (Personal)**

**IV.**  **Agent Referrals**

**V.**    **Claims**

      A.    Need to be involved

**VI.**  **Special Events**

      A.    April 2 - 7 in Madison - Training

**VII.** **Open Forum - Discussion on Various Topics**

## District 232 Monthly Meeting
March 14, 2001

"Your either part of the steamroller, or part of the pavement"
--- Robert V. Franco --- Michigan

**Richard D. Robinson - District Manager**

**Guest: Vonda George - Automation Trainer**

## *Agenda*

**I.    Production**

    A.    Monthly production (District 232)
    B.    New business commission
    C.    AFLIC
    D.    All-American
    E.    Commercial lines
    F.    Umbrella Double Points
    G.    Mortgage Term Contest

**I.    Vonda George - Reference Manuals & LPOS**

**II.    Life Sales Track Presentation**

**III.    Power Position Your Agency: A Guide to Agency Success**

    "Ronda Mettey" - pages 29 - 63

**IV.    Training**

    A.    Lookout for Car Scams
    B.    Endorsements and Options (Ronda)
    C.    New Grilling Requirements

PLAINTIFF'S  AFFIDAVIT

EXHIBIT G

D.    Churning
E.    Customer Billing Rules & Helpful Hints
F.     Ohio Property Picture Requirements
G.    Mobile Dent Repair
H.    Flyer (Handout)
I.     Focus on profit

## I.    **Marketing Plan**

A.    Are we all following it????
B.    Cold calling - Monday and Wednesday nights - State Office

## I.    **Agent Automation Agreement**

A.    Equipment Fees/Cafeteria Plan

## II.    **Enroll in the Realtor Expo**

## III.    **Life Apps Sent in (Personal)**

## IV.    **Agent Referrals**

A.  Jamie Best (Christina Corwin)

## I.    **Services**

A.    Notary
B.    BNI Networking
C.    See homes in Morning

## I.    **Special Events**

A.    District Picnic - ideas

## II.    **Open Forum - Discussion on Various Topics**

# District 232 Monthly Meeting
April 18, 2001

"Success = Good Planning, Careful Execution, and a Strong Commitment to
doing the right things right!"
-Marie Fletcher

**Richard D. Robinson - District Manager**

**Guest: Geraldine Robinson - Casualty Specialist**

## *Agenda*

**I.** **Production**

    A.    Monthly production (District 232) Round Robin Discussion
    B.    New business commission
    C.    AFLIC
    D.    All-American
    E.    Commercial lines
    F.    Long Term Care Contest (most apps all lines) 4/1 - 4/30
    G.    Increase App goal - District of the Month??
    H.    New Contest Bonus
    I.    Fax in Apps - 608 243-6531 or amnet 700 233-6531
    J.    Numbers Gut Check
    K.    ACP Income - Accumulative
    L.    Joint Sales Calls - Business Consultant

**I.** **Geraldine Robinson  - Claims**

**II.** **Fortune 500 Company Number 361**

**III.** **Power Position Your Agency: A Guide to Agency Success**

**PLAINTIFF'S  AFFIDAVIT**

**EXHIBIT H**

"Tim Morgan" - pages 67 - 97

## IV.  Training

    A.    Transferred policies to people with staff only
    B.    Life Policies AFT or Annual - **ONLY**
    C.    Must write Life & Commercial business to **SUCCEED**
    D.    BOPP Rentals - like Gold Star Homeowners
    E.    ITV Changes
    F.    New Homeowner Eligibility Guidelines
    G.    ACP Agent Review
    H.    Option D1 Training Issue
    I.    Churning
    J.    Death Claims
    K.    Deal Makers/Deal Breakers
    L.    SR-22
    M.    Valley AFMIC Advantage Procedure - Prequalify
    N.    June 30 - New homeowner surcharge; collections being dropped
    O.    One (1) Loss over $1000.00 will be acceptable
    P.    Boat Owner Changes
    Q.    Audits - Use digital camera ex. Renewal notices

## I.  Marketing Plan

    A.    Are we all following it????
    B.    Cold calling - Saturday Mornings 9:30am - 11:30am (Need 5 apps) State Office
       - **No excuses or EXCEPTIONS**
    C.    Fax over Agency Register w/5 names

## I.  Agent Referrals

    A.  Mary Wilson (Joel Loyd)

## I.  Special Events

    A.    District Picnic - August 11, 2001 (Dayton) w/District 226
    B.    May 19, 2001 - Kickoff New All American Saturday night
    C.    June 29th Awards Banquet

    D.      State Picnic - date to be announced

**I.**    <u>**Open Forum - Discussion on Various Topics**</u>

    A.      Cincinnati Chamber Expo

# District 232 Monthly Meeting
May 16, 2001

" Dream about the future,
build upon that dream,
and then do what it takes to get there."
— Written— Submitted by Dan Kelly and all his friends --- Illinois

### Richard D. Robinson - District Manager

### Guest: Jackie Clark - Casualty Claims Specialist

## *Agenda*

**I.  Production**

    A.    Monthly production (District 232) Round Robin Discussion
    B.    New business commission - Agent Income Summary
    C.    AFLIC
    D.    All-American
    E.    Commercial lines $1000 Club
    F.    Increase App goal - District of the Month??
    G.    District Ranking
    H.    Winners  VS  Losers
    I.    Joint Sales Calls - Business Consultant
    J.    Profit Reports
    K.    ACP Performance Reports
    L.    San Francisco All American Qualifiers
    M.    ACP Graduation

**I.  Jackie Clark - Quick Pay**

    A.  Qwik Pay Collision Rules

**PLAINTIFF'S  AFFIDAVIT**

**EXHIBIT I**

I.    **Success**

    A.     Dress
    B.     Answer Phone
    C.     Presentations - Proposals
    D.     Habits - Form good habits NOW
    E.     Agent Article - Success

**Power Position Your Agency: A Guide to Agency Success**

       "Richard Robinson - Pages  - pages 91 - 97
       "Jason Blank - Pages - 99 - 133

I.    **Training**

    A.     Saturday hours ????
    B.     Life Policies AFT or Annual - **ONLY**
    C.     Must write Life & Commercial business to **SUCCEED**
    D.     Premium Trust Account Authorization
    E.     Storm Claims Procedures
    F.     New Homeowner Eligibility Guidelines
    G.     Ohio South Counties
    H.     AFFS Rate Reduction
    I.     Client's Email Address - www.bluemountain.com
    J.     Event Center - Register for Classes (including staff)
    K.     Kiplinger Report - Article
    L.     Movers Guide
    M.     Insurance Quote Rating and Ranking
    N.     Quote Intake and Changes on gathering information forms - Deb Harp
    O.     Advertising - Logo - Deb Harp
    P.     TPI Payment Processing Changes
    Q.     Umbrellas - More creative selling techniques - Any ideas??
    R.     New Homeowner's Program and surcharges
    S.     New ADS enhancements

I.    **Marketing Plan**

    A.     Are we all following it????

I.  **Agent Referrals**

    A.  Ronda Mettey (Richard Barrett)

I.  **Special Events**

    A.    District Picnic - August 11, 2001 (Dayton) w/District 226
    B.    May 19, 2001 - Kickoff New All American Saturday night
    C.    June 29th Awards Banquet
    D.    State Picnic - ARMCO Park July 14, 2001

I.  **Open Forum - Discussion on Various Topics**

    A.    Video

1/4/2001

40 ~~50~~ 60    And policies

| | apps |
|---|---|
| 5 | ASIC |
| 15 | AFMIC |
| 10-15 | Homeowners |
| 9-12 | Life APPS |
| 4-5 | Commercial's |
| | ~~scribble~~ |
| | Health |
| 1 | LTC |
| 1 | Umbrellas |
| 3 | |

47    51

**PLAINTIFF'S AFFIDAVIT**

**EXHIBIT K**

 **AMERICAN FAMILY INSURANCE**    L I F E   D I A M O N D   C L U B   M E M B E R

January 8, 2001

Ronda Mettey
3540 Blue Rock Road  Ste 4
Cincinnati, OH 45239

Re:  Meeting - January 4, 2001
     Marketing Plan

Dear Ronda,

As your new District Manager, effective January 1, 2001; I am aware, after talking with Cassandra Stiff, that production has been a challenge for you in the past and your previous manager was trying to help you meet those challenges.

You and I have discussed District 232's Marketing Plan. I believe by following the plan, you will be able to achieve the goals we have set: 47-51 apps per month, increased activity, and hands on assistance from me.

You were appointed as an agent on May 1, 1998. In the past year, you have averaged 22 applications per month and $645.00 in new business commission. This is not an acceptable level of performance for an agent with almost three years of experience in the Valley Region.

Also, we discussed strategies on increasing production and office proficiency by: installing a sign, having an open house, life sales ideas, staff, customer service, organization, and time management.

We would like to see you and your business prosper and grow to new heights. If these challenges aren't met it could lead to termination of your agency contract.

Sincerely,

Richard Robinson
District Manager - 232

cc:  Cassandra Stiff
     Sales Director - Ohio South



**PLAINTIFF'S AFFIDAVIT**

**EXHIBIT L**

 *The Mark of Distinction*


**AMERICAN FAMILY**
**INSURANCE**

# LIFE DIAMOND CLUB MEMBER

May 10, 2001

Ronda Mettey
3540 Blue Rock Road Ste 4
Cincinnati, OH 45239

Re: Meeting on May 2, 2001
    Meeting on May 9, 2001
    Production

After our conversation on April 16, 2001, I had some concerns about your agency continuation. I was glad we were able to address those concerns in our meeting. You stated "that the passion was gone," and you felt like you were just "going through the motions." I'm happy to see you are no longer feeling that way and have decided to make the commitment to your business.

In reference to your last five months production, I haven't been very pleased. We discussed the low application count and that you are not on track for AFLIC or the All American campaigns. You indicated that your application count would remain low; however, you agreed to focus on AFLIC. We will focus on the life area for the moment and then increase applications.

We discussed some of your challenges in the past. I cannot change the past. I can only help you with your future success. I have tried several different communication techniques with you and tried to find ways to motivate you. At one time, you stated family was your motivation. Therefore, I said that if you wrote 40 apps, I would run your office for a day and you could spend time with your family. You did not achieve that goal.

At our meeting, you said having a sense of pride and accomplishment was your motivating factor. Pride and accomplishment should be evidenced by effort; however, you didn't win the latest contest in the district. I will continue to search out what motivates you so you can have a successful business and family life.

I have offered my advice to you in the past and you have called it "double talk," "taking over," "taking control," "it won't work," or just ignored it all together. If we are to grow and have a successful business relationship, we need to work together and you need to be open to new ideas. I will continue to work with you to find motivation so you can have a successful business and family life.

I have attached your two letters that you said were important in developing our relationship and increasing your business production. I have shared with you the Valley Regional Business Plan. In that plan we discussed increasing your application count to 40 apps per month and increasing new business commissions to $1500.00 per month. We will review your situation in August to determine if you are in line with the business plan. If you are not in line with the plan, it could lead to termination of your agency contract. I hope that 2001 will turn out to be your best year yet!

Sincerely,

Richard Robinson
District Manager - 232

cc: Cassandra Stiff

Attachments

DEPOSITION
EXHIBIT

3

*The Mark of Distinction a*

**PLAINTIFF'S AFFIDAVIT**

**EXHIBIT M**

**AMERICAN FAMILY**
**INSURANCE**  **.**  L I F E   D I A M O N D   C L U B   M E M B E R

KEN TOUREENE, DISTRICT MANAGER 225 • 4660 DUKE DRIVE, SUITE 110 • MASON, OHIO 45040 • PHONE: (513) 336-9829

May 14, 1998



DEPOSITION
EXHIBIT

12/30/03    Ln

Re: Productivity/Activity and New Business Requirements

Ronda, as we have previously discussed, you will have sales and activity requirements while you are on ACP, and thereafter. The purpose of ACP is to help you finance your Agency expenses during the initial start up period of agency operations.

Based on your personal and business expenses, your ACP budget will be $2500 per month. This leaves $1900 per month in new business commissions you will need to average every month to meet your personal and business expenses as provided by you.

In order to meet the $1900 requirement you will need to have production goals for yourself which I am confident you have already started to establish. It is important to concentrate on the daily activities for achieving your goals. If you follow the daily activities I have described below, you will achieve your production goals.

Daily Activity and Production Requirements:

- Complete Daily Activity Report - include specifics, cold calling stats, appointments for that day, sales made, leads generated, future appointments set
- Minimum of three life appointments each week
- Hire part-time ex-dater immediately and train them on the same techniques you are trained on. This will generate leads for you to follow up on.
- Cold call 12-15 hours per week for appointments
- 30 appointments per week with PIR to penetrate the HH
- Average New Business Commission of $1900 per month

Ronda, I would obviously like for you to accomplish All- American and AFLIC as soon as possible, however it is important that you are aware of the activity levels necessary to achieve both of these designations. You will need to schedule 30 appointments per week with a minimum of 3 being for life insurance. Please regularly review the cold calling techniques and daily activity training for new agents.

We will continue to meet on an ongoing basis to review your trials and successes. Because American Family is committed to your success, we will also meet with the State Director on a continual basis to review your production and offer any needed assistance.

You must meet the above requirements to reach the business and budget needs you have outlined for yourself. If they are not met, the results could lead to termination of your



*The Mark of Distinction*

**PLAINTIFF'S AFFIDAVIT**

**EXHIBIT N**

ACP contract and agency with American Family Insurance. As you know Ronda, I have great faith in your ability and I am confident the minimum requirements will pose no problem for you to achieve. So lets set those goals high and work hard to accomplish them.

Congratulations on your full-time appointment, and I look forward to training and assisting you in the areas needed.

```
ALL LINES SUMMARY        AMERICAN FAMILY AGENT SYSTEM           AAM21020
-----------------        ---------------------------           --------
AGT DST  004 232              NAME  RONDA A METTEY
  FOR  07 2001
```

| | APPS - CAL YR | | POINTS - AA YR | | PREMIUM - CAL YR | |
|---|---|---|---|---|---|---|
| | MONTH | ACCUM (NET) | MONTH | ACCUM (NET) | MONTH | ACCUM (NET) |
| AUTO | 7 | 51 | 24 | 74 | | |
| ASIC | 1 | 36 | 4 | 40 | | |
| PERS. UMBRELLA | 1 | 1 | 20 | 20 | | |
| FIRE | 0 | 0 | 0 | 0 | | |
| HEALTH | 0 | 0 | 0 | 0 | | |
| HOMEOWNERS | 6 | 35 | 40 | 80 | | |
| AFFS | 0 | 0 | 0 | 0 | | |
| BUSINESS | -1 | 3 | 0 | 4 | | |
| ANNUITY | 0 | 0 | 0 | 0 | | |
| LIFE | 0 | 5 | 0 | 76 | 0 | 1795 |
| NOT TKN | -4 | -13 REV | -18 | -45 | | |
| PRIOR CORR | 0 | 0 CORR | -16 | -16 NOT TKN | 0 | 0 |
| TOTAL | 14 | 131 | 54 | 294 | 0 | 1795 |

```
Enter-PF1---PF2---PF3---PF4---PF5---PF6---PF7---PF8---PF9---PF10--PF11--PF12---
               PREV                                                      MAIN
```

- Ronda Mettey meeting w/ Cassandra    7/24/01
  Agent Termination                    @ 1:35pm

  - No support in running business from Company
    direction in claims handling

    - talked about Claims handing my new system

    - thinks we only care about production.

  - talked about our position (being)
        Recruit
        Train
        hire Staff
        So production goes up.
  - Not following the Manager direction

Not being valued

Date: 07/24/2001 Time: 10:51:14 AM

PLAINTIFF'S AFFIDAVIT

EXHIBIT O

19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---------------------------------------------------------

Case No. 1:02-cv-398

RONDA A. METTEY,                    Judge Spiegel

                Plaintiff,    Magistrate

     vs.

American Family Mutual Insurance
Company, et al.,

                Defendants.

---------------------------------------------------------

TRANSCRIPT OF

**VIDEO DEPOSITION OF KEVIN BEGIN**

March 3, 2004

Jean M. Whalen, RDR, CRR
HOFFARTH & WHALEN, INC.
5673 133RD STREET COURT
APPLE VALLEY, MINNESOTA 55124-4410
OFFICE (952) 432-4240  *  FAX (952) 432-7787

COPY

Kevin Begin    3/03/04

| | | |
|---|---|---|
| 1 | Q. | Now, would you please give us a little information |
| 2 | | about your background?  What was your education? |
| 3 | A. | I'm a graduate from the University of Minnesota. |
| 4 | Q. | And how old are you? |
| 5 | A. | I am 42. |
| 6 | Q. | When were you first licensed as an insurance agent? |
| 7 | A. | First licensed as an insurance agent in 1993, I believe |
| 8 | | the end of 1993. |
| 9 | Q. | And for what state was that? |
| 10 | A. | For Minnesota. |
| 11 | Q. | Do you hold licenses in any other states? |
| 12 | A. | In Wisconsin as well. |
| 13 | Q. | Did you hold a license in Ohio? |
| 14 | A. | When I was there as a district manager. |
| 15 | Q. | When were you first an agent with American Family? |
| 16 | A. | I officially started April 1, 1994. |
| 17 | Q. | While you were a district manager in Ohio, were you an |
| 18 | | employee or an agent? |
| 19 | A. | I was an employee.  I was a district manager while I |
| 20 | | was in Ohio. |
| 21 | Q. | What was your first experience as a district manager |
| 22 | | for American Family Insurance? |
| 23 | A. | My first experience?  It was down there in Cincinnati. |
| 24 | | That was my first experience as a district manager, is |
| 25 | | when I had started down there in Cincinnati, in |

1    A.    Correct.

2    Q.    And what dollar amount would your new recruits receive

3          for advance compensation plan payments?

4    A.    Generally, most of them across the board, John, were at

5          2,500.

6    Q.    Even though a person's budget was -- even though a

7          recruit's budget was different, then, the 2,500 was

8          constant; is that correct?

9    A.    That was the direction given by Cassandra, was that was

10         going to be -- for 99 percent of the people across the

11         board, that was going to be the set budget.  And then

12         it was up to us as managers to make the numbers work

13         after that, to get the budget to work for the 2,500.

14   Q.    Would you say one of the ways to get the numbers to

15         agree would be to adjust the new business commission?

16   A.    Correct.

17   Q.    Would you please refer to what has been marked as

18         Plaintiff's Exhibit No. 5.

19   A.    Okay.

20   Q.    Tell us, can you identify that exhibit?

21   A.    This was also part of their -- once they became an

22         agent, this was the letter back from Ron Glowac.  Ron

23         was the person who gave approval of an agent's file.

24         Once it had been completed by us as district managers,

25         it went to Cassandra Stiff.  She reviewed the budget.

1    A.   They were the lowest, from what we could see.  The

2         premiums were the lowest of all the operating states

3         that American Family was in at that particular time,

4         from what I saw.

5    Q.   When -- during the recruiting process, you were

6         computing the budget -- to compute the new recruit's

7         budget?

8              THE COURT REPORTER:  I'm sorry, could you

9         repeat that, please?

10   BY MR. REBEL:

11   Q.   During the computing of a new agent's budget, did you

12        use premium rates?

13   A.   We used average new business commission based on what,

14        you know, the average policy was bringing in down there

15        at that particular time.

16             At the time, you know, when we were starting

17        as district managers, we had very few agents, so we

18        didn't have a whole lot of reference points on the

19        premium, on what they were going to generate on there,

20        too.  But we used, on average, for some of the initial

21        agents, at least I did, some of the initial agents that

22        were down there, generally on what were they bringing

23        in in a general auto premium, what was their homeowners

24        average premium.  And then from there, we derived what

25        their commission would be in order to figure out what

Kevin Begin    3/03/04

1       better-producing agents.

2   Q.   What would your median or your average sales agent --

3        give us ballpark numbers.

4   A.   I missed that whole question.  You're going to have to

5        give that to me again.

6              MR. REBEL:  We're going to -- we would like

7        to take a short break.  Is that okay?

8              THE WITNESS:  Sure, that's fine.

9              THE VIDEOGRAPHER:  Going off the video record

10       at approximately 10:41 a.m.

11             (A brief recess was taken.)

12             THE VIDEOGRAPHER:  We're back on the video

13       record at approximately 10:53 a.m.

14  BY MR. REBEL:

15  Q.   Kevin?

16  A.   Yes.

17  Q.   When you were in the process of recruiting, did you

18       tell the new recruit the number of hours that he or she

19       would work per week?

20  A.   In general, broad terms, we told them that this wasn't

21       going to be a 9-to-5 type job, because again, it was a

22       business opportunity for them to come in.  But did we

23       give them exactly -- at least in my case, did I give

24       them exact amount of hours?  No, I did not.

25  Q.   Did you state that it would be in excess of 40 hours

Kevin Begin    3/03/04

1          per week?

2    A.    Correct.

3    Q.    The -- do you have any information as to the agents in

4          your district, the number of hours that they would be

5          working per week?

6    A.    I had some that were, you know, in excess of probably

7          60 hours a week, I'm sure.  It just depended on how

8          much time they wanted to put in.  I had one agent, Judy

9          Sadler, that put in a ton of hours and was at the

10         dealerships at night and et cetera, too, so she put in

11         a ton of hours.  I mean, it basically varied upon the

12         agent and their particular drive, how many hours that

13         they wanted to put in.

14   Q.    At any time did the regional sales director, Cassandra

15         Stiff, did she require the employee -- the agents to do

16         specific tasks at specific times of the day?

17              MS. JOHNSON:  Objection.

18   BY MR. REBEL:

19   Q.    Well, you can answer.

20   A.    Okay.  Yes.  At one point, we were told to fill out

21         their weekly time schedules for them, putting in at

22         certain hours they were doing cold-calling, certain

23         hours they were running appointments.  She wanted their

24         whole weeks mapped out.

25   Q.    And would that require working on the weekend?

Kevin Begin    3/03/04

1    A.    They -- at one point they had stated that -- it was

2          Cassandra and Ralph Kaye (phonetic) wanted to make it

3          mandatory that the agents had to work on Saturday

4          mornings from at least 9 to 12 or 9 to 1.  They wanted

5          all the agents to work on Saturday morning in an effort

6          to increase production, because production was lagging

7          behind their region goals.

8    Q.    Do you recall if this request was in writing from

9          Cassandra?

10   A.    There might have been an e-mail blurb that was sent

11         out.  There may be a record of that somewhere, that

12         there was an e-mail.  I know it was verbalized to us in

13         one of our managers meetings.  But I believe also that

14         she generated an e-mail out to the district managers

15         that these were the expectations that we were to lay

16         out to our agents.

17   Q.    Were the managers in agreement with her?

18   A.    I can only speak for myself and a couple of the other

19         managers.  No, they were not.  They had questions as to

20         how we could -- as I did, how we could dictate to them

21         that they had to work on a set schedule or how they had

22         to work on Saturdays when they were independent

23         contractors.

24   Q.    Did you -- did any of the managers express this to

25         Cassandra?

Kevin Begin    3/03/04

1    A.    Yes.  At one point, one of the district managers that's

2          still down there, Cindy Green, had.  And she relayed

3          this to us.  I was not privy to the exact conversation,

4          but relayed this to us after the fact, that she had

5          questioned whether we could ask the agents to work on

6          Saturday mornings; and at that point, Cassandra

7          questioned whether she had what it took to be a

8          district manager and to stay down there in Ohio.

9    Q.    Do you know if any of the managers, in writing,

10         protested to American Family Insurance headquarters?

11   A.    That I'm not privy to.  For myself, I did not send an

12         e-mail.  Again, we were -- we may have verbalized that

13         behind the scenes, but we were all pretty scared to

14         ever put anything in writing to any powers above us.

15   Q.    Did you have a marketing plan for your district?

16   A.    I did.  I had a new agent's manual that I had put

17         together that was kind of used by some of the other

18         district managers; I had a marketing manual that I

19         outlaid for my agents; then I also had a new agent's

20         manual that I put together, my wife and I had put

21         together, to share with them kind of the -- some of the

22         little things that American Family didn't cover during

23         the initial training process.  It's what I did, but it

24         varied.  Some of the managers didn't -- didn't have

25         anything as elaborate.  So I can only speak for myself.

Kevin Begin    3/03/04

1    Q.    In the materials that you prepared, would you have a

2          schedule where the agent would spend so much time doing

3          a certain task on each day?

4    A.    In the new -- the marketing class that I put on for

5          them, there was a sample in there, and it was one of

6          Kenny's -- Ken Toureene's schedules was as an example

7          of how they could lay out their time, because we

8          emphasized that it was important -- time management was

9          one of the biggest failures of new agents, is that they

10         didn't know how to manage their particular time.  At

11         that time when it was given out in the marketing class,

12         it was not a required piece, but it was something for

13         them to use as a reference that would help them to get

14         an idea of how to schedule their week out.

15   Q.    If an agent did all of the tasks which Cassandra wanted

16         performed, including the Saturday morning, do you have

17         an idea of how many hours they would be working per

18         week?

19               MS. JOHNSON:  Objection.

20   BY MR. REBEL:

21   Q.    You can go ahead and answer that.

22   A.    Again, it depended upon the effectiveness of that

23         particular person.  You know, if they were able to do

24         in a 40-hour time period, 50-hour time period the

25         required activities in order to generate the type of

HOFFARTH & WHALEN, INC.
PHONE (952) 432-4240   *   FAX (952) 432-7787

Kevin Begin    3/03/04

```
 1        activity and applications that they needed, then yes,
 2        they could get it done in less time.  But if someone
 3        was new or struggled or didn't have the background in
 4        insurance, yes, it's very possible that they could have
 5        been working in excess of, you know, 50, 60 hours a
 6        week to follow all the guidelines.  If they were going
 7        to be doing the cold-calling to generate the
 8        appointments, it was extremely difficult to cold-call
 9        down there, because no one answers their phones at
10        night.  So if you spent four hours calling --
11        cold-calling at night, you might garner maybe one or
12        two people that might be interested in an appointment
13        with you at that point.  I personally didn't have my
14        agents working cold-calling so much.
15   Q.   Now, for commercial insurance in the Ohio South region,
16        was there an underwriter for commercial insurance?
17   A.   I'm trying to think if the commercial lines underwriter
18        was in -- I believe they were down in St. Joe's at that
19        particular time as well.  I think all the commercial
20        lines underwriters at that point were down in
21        St. Joe's.  The personal lines underwriters for the
22        Valley region at that particular time, they were in the
23        Columbus state sales office.
24   Q.   When an agent had a potential commercial insurance
25        customer, who -- in Ohio South during the time period
```

1       the agent had sent to them.

2   Q.  The -- you have -- do you have an idea as to what the

3       average amount of time it would take for an agent to do

4       the underwriting on a homeowners policy?

5   A.  To run the reports that were required, running the

6       credit, filling out the applications, going in and, you

7       know, having to drive to the particular location to

8       look at the risk, you know, get inside the property and

9       photo everything, you know, it's a fairly

10      time-consuming process for each individual application.

11  Q.  The -- did the sales agents in Ohio South adjust small

12      automobile damage claims?

13  A.  Some of the agents were put on what was called

14      quick-pay authorization that, up to a certain dollar

15      amount, they could cut a check from their particular

16      office for the smaller-type losses.  You are correct

17      with that.

18  Q.  Now, going back to the homeowners underwriting in

19      Minnesota during the time period we're talking about,

20      1999, 2000, early 2001, did -- were there any assigned

21      employees that did homeowners underwriting?

22  A.  You're asking for Minnesota up here when I came back?

23      Because I can't speak to what was going on while I was

24      down there in Ohio, but I can speak to what we do as

25      agents up here currently and what's involved.

Kevin Begin    3/03/04

1    Q.    What do you do now?

2    A.    The same thing.  We have to go out and inspect every

3          risk, photo it, arrive at the evaluations, run the

4          exact value to derive what the current replacement

5          value is of the home, run their appropriate property

6          claims loss reports to check on the people's

7          backgrounds to make sure that they haven't had any

8          other homeowners losses in the last, you know, four or

9          five years with that, which would render them, you

10         know, uninsurable as far as we're concerned with that.

11         We have to drive all throughout the area here to

12         inspect the risk and, you know, fill out the

13         applications and checking with the mortgage companies

14         to make sure that the mortgagee clause is correct and

15         faxing binders over to them prior to their closing.

16         It's a pretty time-consuming endeavor for each

17         application with that.

18   Q.    In the Valley region, was there a consumer -- a

19         customer service call center during the time in

20         question, the '99 through 2001?

21   A.    The claims call center came fairly rapidly down there

22         that, you know, if it was after hours, we -- our agents

23         left the general phone number that a person could call

24         to leave a particular claim on there after hours.  But

25         Cassandra generally wanted all the agents to talk to

Kevin Begin    3/03/04

1    their particular clients, to walk them through the

2    claims process, so she generally wanted -- what they

3    had trained the agents in on was talking with the

4    insured about the claim and then doing a three-way and

5    then bringing in the claims call center at that

6    particular point and then passing it off to them to

7    finish the processing of the claim.  But during times

8    of catastrophes, et cetera, when the claims call center

9    was overwhelmed, then the agents ended up having to

10   fill out the claims themselves in the office.

11 Q.  Was there a call center where a customer could call to

12      make a change on their policy?

13 A.  No, there was not.  For that, they had to speak with

14      the agent and/or their staff person in order to process

15      any kind of, you know, vehicle change, we bought a new

16      vehicle or we want to add a snowmobile or boat or

17      whatever.  They would have to call the agent to do any

18      of those changes.

19 Q.  As a district manager or sales agent, did American

20      Family provide you with a guideline that specified what

21      was an independent contractor as opposed to what was an

22      employee?

23 A.  I was never privy or given anything that had the legal

24      definition of what an employee was versus an

25      independent contractor.  No, I was not, nor were our

Kevin Begin    3/03/04

1   Q.   Is it fair to say that if production is lacking, that

2        it's very possible that time management or lack of the

3        ability to properly time manage is one of the problems?

4   A.   It very possibly could be.  That could very well be

5        used as an indicator.

6   Q.   Because earlier, you were talking about that the

7        production just wasn't there in the Valley region, and

8        time management was something that American Family

9        began to look at to help their agents get to be more

10       productive or more profitable.  Is that an accurate

11       assessment?

12  A.   Well, I think they just wanted confirmation of what

13       their schedules were each week.  They wanted these set

14       schedules for them, thinking that that was going to

15       improve production per se by making sure that their

16       weeks were all mapped out for them.

17            But consequently, you know, when we came down

18       there, there were so many things working against the

19       agents in the fact that it was a new sales state; we

20       were fighting lack of recognition; they were all

21       scratch agents; they were new to this career, didn't

22       have any prior background, most of them didn't have any

23       prior background in insurance.  They had a lot of

24       things working against them.  You know, the premiums

25       being as low that they were, I mean, there was a lot of

1      realities that they had to face, and the production

2      just wasn't there.

3              They had projections that they wanted the

4      agents writing 60 aps a month.  That was their goal on

5      their business plan that they were using from the

6      start, and that wasn't happening.  At the time that I

7      was down there, we had very few agents that were

8      writing 60 aps or above.

9   Q.  And recog -- those obstacles that you talked about, an

10     agent would have known that going into the program, is

11     that correct, would have known that American Family was

12     just starting in this territory and would have known

13     that -- would not have had a strong referral source and

14     didn't have existing agencies that you could work off

15     of?  I mean, all those things that you talked about,

16     that should not have come as a surprise to any of the

17     agents, should it?

18  A.  In reality, probably -- I doubt if very few of them

19     were truly aware of the total situation.  I mean, we as

20     district managers were more aware of that.

21              These were people that were fresh to the

22     business, excited about the career, didn't have any

23     idea on how difficult that it was, in reality, to have

24     these particular referral sources.  Yes, we told them

25     as far as -- you know, that American Family was

Kevin Begin     3/03/04

```
1    relatively new to this particular sales state, but we
2    had been a company that had been in business a long
3    time.
4              But as far as the realities of production,
5    premium, commissions, how much ultimately that they
6    were going to make in commissions, they didn't know
7    that, nor did we really, as district managers, didn't
8    know that in its entirety, too, because it was a
9    brand-new situation.  Nobody knew how ultimately it was
10   going to turn out, because it was an evolving process.
11   I don't think the company had any idea on how difficult
12   it was going to be to get things up and running.  I
13   don't think anybody had an idea of how slow that this
14   process was going to take.
15 Q.  Well, let me ask it this way.  As a recruiter, do you
16     feel that you held anything back or that you weren't
17     upfront and honest with the people you were recruiting?
18 A.  No, I don't believe so.  I mean, it just -- it's how
19     much in-depth that you want to go to.  I mean, it was
20     up to the individual district manager.  You know, when
21     you're under heavy recruiting pressures with that,
22     too --
23 Q.  Mm-hmm.
24 A.  -- I mean, do you want to give them all the realities
25     of the job when it's an evolving process?  Probably
```

51

```
 1        not.  Because again, we didn't know ultimately how it

 2        was all going to evolve into, because again, it was a

 3        total evolving process.  But I would say, you know,

 4        what other district managers did recruiting agents, I

 5        can't speak to.

 6   Q.   All right.  But you yourself felt that you were upfront

 7        and honest with any prospects that you were talking

 8        with?

 9   A.   Yeah, I believe so, to the best of my ability.

10   Q.   I have never run my own business, but it seems as

11        though when you're running your own business, there

12        will be times when you need to invest your time in

13        doing something that doesn't directly translate into

14        money in your pocket.  Is that fair to say, that as a

15        business owner, you get tied up doing things that need

16        to be done but don't necessarily result in, as I said,

17        profit or money in your pocket?

18   A.   I would agree with that.

19   Q.   And as an agent running your own agency, do you think

20        that would hold true as well?

21   A.   I would agree with that as well.

22   Q.   Exhibit No. 1 is the letter from Mr. Meyer.

23   A.   Okay.

24   Q.   Do you take any -- or have any challenge with regard to

25        paragraph 3, where he says that the best structure with
```

1    discussing, that Cassandra Stiff required the agents to

2    make cold calls?

3              MS. JOHNSON:  Objection.

4    BY MR. REBEL:

5    Q.   You can answer that.

6    A.   For some of the district managers, yes, she did.  She

7         wanted the -- you know, certain agents in -- you know,

8         required -- she wanted the manager to have the agents

9         in their office doing their cold-calling, et cetera,

10        to -- for certain nights of the week, et cetera.  You

11        know, it was basically under her direction to have the

12        district managers have their -- these agents come to

13        their particular office and cold-call out of the

14        district manager's offices.

15   Q.   If an agent would refuse to do that or if an agent

16        would resist doing that, that would be a grounds for

17        terminating the agency?

18   A.   That I can't -- I can't say what their grounds were.  I

19        know that if an agent refused to do that and that was

20        relayed from the district manager to Cassandra, she

21        would not be happy with that particular individual.

22   Q.   Do you know if that refusal to make the cold-calling

23        would be a factor in terminating an agency?

24              MS. JOHNSON:  Objection.

25   A.   Again, I can't -- I can't speak as to what her criteria

#2

**AMERICAN FAMILY INSURANCE**₀  L I F E    D I A M O N D    C L U B    M E M B E R

KEN TOUREENE, DISTRICT MANAGER 225 • 4560 DUKE DRIVE, SUITE 110 • MASON, OHIO 45040 • PHONE: (513) 336-9829

May 14, 1998

Re: Productivity/Activity and New Business Requirements

Ronda, as we have previously discussed, you will have sales and activity requirements while you are on ACP, and thereafter. The purpose of ACP is to help you finance your Agency expenses during the initial start up period of agency operations.

Based on your personal and business expenses, your ACP budget will be $2500 per month. This leaves $1900 per month in new business commissions you will need to average every month to meet your personal and business expenses as provided by you.

In order to meet the $1900 requirement you will need to have production goals for yourself which I am confident you have already started to establish. It is important to concentrate on the daily activities for achieving your goals. If you follow the daily activities I have described below, you will achieve your production goals.

Daily Activity and Production Requirements:

- Complete Daily Activity Report - include specifics, cold calling stats, appointments for that day, sales made, leads generated, future appointments set
- Minimum of three life appointments each week
- Hire part-time ex-dater immediately and train them on the same techniques you are trained on. This will generate leads for you to follow up on.
- Cold call 12-15 hours per week for appointments
- 30 appointments per week with PIR to penetrate the HH
- Average New Business Commission of $1900 per month

Ronda, I would obviously like for you to accomplish All- American and AFLIC as soon as possible, however it is important that you are aware of the activity levels necessary to achieve both of these designations. You will need to schedule 30 appointments per week with a minimum of 3 being for life insurance. Please regularly review the cold calling techniques and daily activity training for new agents.

We will continue to meet on an ongoing basis to review your trials and successes. Because American Family is committed to your success, we will also meet with the State Director on a continual basis to review your production and offer any needed assistance.

You must meet the above requirements to reach the business and budget needs you have outlined for yourself. If they are not met, the results could lead to termination of your



*The Mark of Distinction and Achievement*

Toureene
EXHIBIT  #2
3-4-04  mm
GRAMANN REPORTING, LTD.

# FINANCIAL DATA ANALYSIS
## AMERICAN FAMILY INSURANCE GROUP – MADISON, WI.

In the event that you will need financial assistance in getting started on a full-time career, now or in the future, this data sheet will help you to determine your budget needs.

Touseene
EXHIBIT #3
3-4-04    mm
GRAMANN REPORTING, LTD.

| HOME | | TAXES | |
|---|---|---|---|
| House payment/Rent | $ 650 | Real Estate | $ |
| Fuel | 70 | Personal Property | |
| Electricity | 40 | Social Security * | |
| Water | N/A | Income (State & Federal) * | 300 |
| Maintenance | N/A | **CREDIT PAYMENTS** Total Monthly Payments (See Credit Profile below) | 333 |
| Telephone | 50 | | |
| **FAMILY** | | **AGENCY OPERATIONS** | |
| Food | $ 240 | Office Rent/Equip./Furn. | $ 500 |
| Clothing | 200 | Secretary/Office Manager | 500 |
| Medical & Dental | 40 | E & O Premium, BOPP, Other Ins. | 50 |
| School | 40 | Heat | 100 |
| Charitable Donations | 40 | Light | 50 |
| Car License & Gas on Bus. side | — | DEFACTO/Computer | 150 |
| Recreation | 100 | Telephone | 200 |
| Other | 50 | Supplies | 200 |
| **INSURANCE** | | Sales Promotion & Advertising | |
| Car | $ 85 | Postage | 50 |
| House | 8 | Car Expense | 125 |
| Life | 60 | Prof. fees/dues/cont. education | $ 10 |
| Health | 173 | Sub-Total (from left) | $ 1846 |
| Sub-Total | $ 1846 | **Total Monthly Budget** | $ 4414 |

What major purchases do you plan in the next six months?    Item _____ Cost (Mo.) $ _____

## CREDIT PAYMENT PROFILE

| Firm | Address | Item | Term | Balance | Mo. Payment |
|---|---|---|---|---|---|
| Ameritech Mobile | | Cell Phone | monthly | 1000 | $ 80 |
| Community Credit | | auto | monthly | 2300 | 253 |
| | | | | | |
| | | | | | |
| | | | Total Mo. Payment | $ | |

| Life Insurance carried? Permanent Term | Auto Insurance Limits? With what company? | Pol. No. if Amer. Family: |
|---|---|---|
| $ 50,000 $ | $100/300/100  Am Fam | Applied for |

Health insurance carried?

☐ Hospital  ☐ Surgical  ☐ Major Medical  ☐ Loss of time

Other people dependent upon you outside of your immediate family (Names and relationship):

Public Law 91-508 requires that we advise you that a routine inquiry may be made concerning character, general reputation, personal characteristics and mode of living. Upon written request, additional information as to the nature and scope of the report, if one is made, will be provided. The undersigned has read and understands this and authorizes American Family Insurance to procure consumer reports from credit reporting agencies and to obtain personal credit information.

| Date 4-12-98 | Applicant Signature x  Ronda A. Metter |
|---|---|

AC 10949  Rev 9/94    *-Consult a tax advisor based on projected income, self-employed.    page 1 of 2

#5

May 27, 1998

RONDA A METTEY 004225
4660 DUKE DR STE 110
MASON, OH 45040-8464

Dear Ms. Mettey:

It is a pleasure to confirm your appointment to American Family Agent's Advance
Compensation Plan.

As you will note in your Agent's Advance Compensation Plan Agreement, which now
becomes a part of your Agent's Agreement, the date of your appointment to the ACP Plan is
effective May 1, 1998. The monthly amounts paid to you are in accordance with the amount
stated on the initial page of your ACP Agreement.

Among the responsibilities which you will assume during the time you are on the Agent's
Advance Compensation Plan are:

1.    Meeting the monthly new business compensation requirement shown in your
      ACP Agreement.

2.    Completing a daily report of your activities and sending it to your District
      Manager each day.

3.    Meeting the expiration date requirements established by you and your District
      Manager.

Your appointment to the Agent's Advance Compensation Plan is evidence that your District
Manager recognizes you as an outstanding candidate to develop a career in the insurance
business. We are confident that you can do the job if you faithfully follow your Manager's
training and leadership. Please accept our very best wishes for success.

Cordially,

RONALD J. GLOWAC - Valley Agency Services Manager
RJG/smr

cc:    Cassandra Ruffin  DX
       Ken Toureene       DM-225

Toureene
EXHIBIT    #5
3-4-04     mm
GRAMANN REPORTING, LTD.

1

1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4                 -    -    -

5   RONDA A. METTEY,              :

6                PLAINTIFF,    :

7       -VS-                  : CASE NO.:   1:02-CV-398

8   AMERICAN FAMILY MUTUAL       :

9   INSURANCE COMPANY, ET AL.,:

10               DEFENDANTS. :

11                 -    -    -

12          Deposition of RICHARD D. ROBINSON, a

13  witness herein, taken by the plaintiff as upon

14  cross-examination pursuant to the Federal Rules of

15  Civil Procedure, and pursuant to agreement and

16  stipulations hereinafter set forth at the offices

17  of Roetzel & Andress, 310 Chiquita Center, 250 East

18  Fifth Street, Cincinnati, Ohio at 2:17 p.m. on

19  Tuesday, May 4, 2004, before Britney L. Fisher, a

20  notary public within and for the State of Kentucky.

21                 -    -    -

22

23

24

```
 1              Q.    Do you know why he resigned?

 2              A.    No, I do not.   Actually I take that

 3    back, yes, I do.

 4                    His son had trouble with the

 5    environment that he was in and he moved to Florida

 6    to get his son away from the environment in

 7    Cincinnati.

 8              Q.    Could you tell me, in the previous

 9    deposition we discussed earned premium write-off as

10    it related to retention of -- as it pertained to

11    retention, could you tell me what is meant by

12    earned premium write-off?

13              A.    Earned premium write-off is a premium

14    that our insureds are being charged when their

15    policy cancels and we keep them insured for another

16    two weeks basically.

17              Q.    And isn't it true that the Agents

18    have begun to backdate the cancellation date?

19                    MS. JOHNSON:   Objection.   You can

20    answer the question if you have an answer.

21              A.    Only with the customer's permission.

22              Q.    Now, this is an activity that

23    Cassandra suggested, isn't that true?

24                    MS. JOHNSON:   Objection.   You can
```

31

1   answer if you have an answer.

2           A.    Cassandra and the company, yes.

3           Q.    The company suggested this?

4           A.    Suggested what?

5           Q.    Backdating of the cancellation date?

6                 MS. JOHNSON:  Objection.  There

7   hasn't been testimony about backdating.

8           A.    Only with the customer's permission.

9           Q.    But the company suggested that?

10          A.    It only -- It makes sense.  The

11  company doesn't have to suggest it, because the

12  customers are cancelling, so --

13          Q.    When the customer cannot be located,

14  is it proper to backdate the cancellation date?

15                MS. JOHNSON:  Objection.  You can

16  answer if you have an answer.

17          A.    If the customer cannot be located, we

18  make two phone calls to the customer, plus send a

19  letter.  And if the customer is nonresponsive

20  before the cancellation, yes, the agents will

21  cancel it.

22          Q.    Will they backdate the cancellation

23  date?

24          A.    Yes, they will.

32

```
 1                MS. JOHNSON:  Objection.

 2           Q.   Now, was there a script of what to

 3    say suggested to the Sales Agent when they make

 4    their telephone call to the policyholder who's in

 5    default of premium?

 6                MS. JOHNSON:  Objection to the term

 7    "script."  You can answer the question if you

 8    know.

 9           A.   Yes.

10           Q.   Would you suggest what was to be said

11    to your Agents?

12           A.   Yes.

13           Q.   And did Cassandra suggest to you what

14    ought to be passed on to the Agents?

15           A.   Yes.

16           Q.   Now, the backdating of the

17    cancellation date was that a part of the agenda for

18    a District Managers meeting?

19                MS. JOHNSON:  Objection to the term

20    "backdating."  I don't think Mr. Robinson has ever

21    said they backdated.

22           A.   Repeat your question.

23           Q.   Let me rephrase it to help you.

24                Did you have a district meeting with
```

33

1  your Agents some time during the year 2003 where

2  you were discussing retention?

3          A.   We discussed retention.

4          Q.   And at the same time did you discuss

5  the earned premium write-off?

6          A.   Let me share that earned premium

7  write-off has nothing to do with retention.  Those

8  are totally two separate agendas.

9          Q.   Do you remember when the meeting

10  dealt with the earned premium write-off?

11          A.   Yes, I do.

12          Q.   Do you recall the month?

13          A.   No, I don't.

14          Q.   Do you have written agendas for your

15  meeting with the Sales Agents?

16          A.   Yes, I do.

17          Q.   And you would have a written agenda

18  for the meeting that you discussed the earned

19  premium write-off?

20          A.   Yes, I would.

21          Q.   And were you -- since it's your

22  agenda, I assume you set the agenda?

23          A.   Yes, I do.

24          Q.   Does Cassandra have any input in

1   setting the agenda?

2          A.   No, she does not.

3          Q.   So you would initiate the discussion

4   of the items on the agenda?

5          A.   Yes, I would.

6          Q.   The company policy dealing with the

7   earned write-off -- earned premium write-off that

8   we've been discussing, was that put in writing?

9               MS. JOHNSON:  Objection.  There's

10  been no testimony that American Family has a

11  policy.  The question previously was whether the

12  company had any suggestion.

13         A.   That is a business practice.

14  Business practices are not necessarily in writing

15  or policy.  As a business owner it is to our

16  benefit to our clients and our customers to be

17  proactive in helping them out.  So the earned

18  premium write-off by calling the insureds and not

19  having that earned premium write-off is to their

20  benefit to not be sent to collections.

21              Because if they were sent to

22  collections, because they owe us money, they

23  probably won't be happy with that.  So as a savvy

24  business owner you would contact the customer and

1   let them know that.

2           Q.    Did any of the District Managers

3   express to you that they felt this suggestion

4   dealing with the earned premium write-off was

5   ethically questionable?

6           A.    Yes.

7           Q.    Did any of the District Managers

8   request that Cassandra put that suggestion in

9   writing?

10          A.    Yes.

11          Q.    How many -- Did more than one

12  District Manager request that it be put in writing?

13          A.    I can only think of one.

14          Q.    And who would that be?

15          A.    Andy Rabas.

16          Q.    Were there any other suggestions by

17  Cassandra that were challenged by District Managers

18  from the standpoint that they could be ethically

19  questionable?

20               MS. JOHNSON:  Objection.  There's

21  not been any testimony that District Managers,

22  plural, have questioned Ms. Stiff's practices or

23  policies.  There was testimony about Andrew Rabas

24  requesting a written policy with regard to the

1                                        (Brief recess.)

2                               (Ms. Mettey left the room.)

3   BY MR. REBEL:

4           Q.    Mr. Robinson, if you would, with

5   regard to the January 8th, 2001 letter that

6   summarized a meeting you had with Ronda on January

7   4th, and was the letter her marketing plan at that

8   time?

9           A.    I'm sorry, say that again.

10          Q.    Let me strike that.

11                Referring to Deposition Exhibit No.

12  No. 20, the District 232 Marketing Plan, was this

13  prepared after January 8th, a few weeks or a month

14  after January 8th?

15          A.    Prepared?

16          Q.    Yes.

17          A.    In what sense?

18          Q.    Typed.

19          A.    For her?

20          Q.    For the four Agents?

21          A.    No.  This was prepared way before

22  this meeting with Ronda.  In fact, I give this to

23  every new Agent that starts today.  And the

24  overwhelming comment that I get is thank you for