UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RONDA A METTEY,                   :
                                  :   NO. 1:02-CV-00398
          Plaintiff,              :
                                  :   **ORDER**
                                  :
     v.                           :
                                  :
AMERICAN FAMILY MUTUAL            :
INSURANCE COMPANY, <u>et</u> <u>al</u>.,     :
                                  :
          Defendants.             :


          Before the Court is the Defendants' Motion for
Summary Judgment (doc. 28), Plaintiff's Response to Defendants'
Motion for Summary Judgment (doc. 39), and the Defendants' Reply
Memorandum in Support of Their Motion for Summary Judgment (doc.
42).

**PROCEDURAL HISTORY & FACTS**

          Plaintiff, Ronda A. Mettey (hereinafter
"Mettey"), filed this action on June 5, 2002 (doc. 1).  In her
initial complaint, Mettey brought four claims against Defendants,
American Family Mutual Insurance Company, American Family Life
Insurance Company, and American Standard Insurance Company of
Wisconsin (hereinafter collectively "AFMI") (<u>Id</u>.).  These four
causes of action were: (1) breach of contract; (2) unjust
enrichment; (3) promissory estoppel; and (4) a claim for wages and
overtime pursuant to the Fair Labor Standards Act, 29 U.S.C. § 203,

(hereinafter "FLSA") (<u>Id</u>.).   On September 19, 2003 the Court granted Mettey the right to file an amended complaint.  In Mettey's Amended Complaint, she only makes claims for breach of contract and wages and overtime pursuant to the FLSA (doc. 15).   Although Mettey's Amended Complaint omits her unjust enrichment and promissory estoppel claims, she acknowledges in her Response to AFMI's Motion for Summary Judgment that she "has no objections to granting Defendant's motion" as to these two claims (doc. 39).   As such, remaining before the Court are the claims announced in Mettey's Amended Complaint (doc. 15).

Mettey is a licensed Ohio insurance agent and resident of Ohio (<u>Id</u>.).   AFMI are Wisconsin insurance companies licensed to do business in Ohio (<u>Id</u>.).   Mettey alleges the following facts.  In 1998, in the Southern District of Ohio, AFMI was recruiting new agents to open new insurance sales offices in the area (<u>Id</u>.).   AFMI recruited Mettey as a new agent to sell insurance exclusively for AFMI (<u>Id</u>.).  Mettey alleges that prior to entering into a contract with AFMI, AFMI promised that the relationship would be a life-long career for her, that AFMI would deal with her in a fair manner and in good faith, that Mettey's renewal premium commissions would be her "investment in the future and would be her retirement", that she would receive full and fair compensation for the renewal premiums paid to AFMI from the policies that she

sold, that Mettey would be her own boss and would be able to manage her business and choose the hours she would work, and lastly that AFMI's premium rates in Ohio would be equivalent to their average premium rates in other states (Id.).

On May 1, 1998 AFMI and Mettey entered into an Agent Agreement and an Agent Advance Compensation Plan (hereinafter "ACP") (Id.). The Agency Agreement and ACP as well as an Agent Manual represent the written contract between Mettey and AFMI (Id.). Mettey contends that she performed her obligations under the contract, including sales and servicing of AFMI's insurance policies (Id.). Mettey also contends that subsequent to entering the contract with AFMI, she was required to lease and furnish an office in Hamilton County, Ohio as well as hire an employee at said office (Id.). As such, Mettey avers she leased and furnished an office at substantial expense, investing $15,000.00 of her own funds in the insurance sales and servicing of the office (Id.). This office was solely for the purpose of selling and servicing insurance policies for which AFMI were the insurers (Id.). During January 1999 to July 2001, Mettey asserts that she employed and managed office personnel at this office (Id.).

During January 1, 1999 to August 1, 2001, Mettey expended weekly, in excess of, nine hours performing customer services by processing changes to existing polices (Id.). Furthermore, Mettey expended, in excess of, three hours performing

-3-

property claims services made by existing policy holders, including adjusting and paying claims (Id.). Additionally, Mettey expended, in excess of, nine hours performing undewriting services by estimating replacement costs, photographing and report preparation and transmission, by taking saliva samples and by obtaining medical records (Id.). Mettey also expended weekly, in excess of, five hours performing premium collection services for existing policy customers (Id.). These, above listed services, Mettey contends were also performed by AFMI employees (Id.). These services, Mettey asserts, AFMI required her to perform despite their being incidental to the outside sale of insurance (Id.). AFMI also required Mettey to attend various regular meetings, seminars, and training sessions (Id.). These required meetings, seminars, and training sessions were unpaid and consumed a substantial amount of Mettey's work time (Id.). Mettey alleges that approximately forty percent of her sixty-five hour work week was spent doing services performed by AFMI's own employees - again work not incidental to the outside sale of insurance (Id.).

During January 1999, Mettey contends that AFMI required her to sell insurance and solicit new insurance business in specific manners and during set times of the week (Id.). AFMI, protests Mettey, required her to meet and locate potential new customers in a set manner and at set times throughout the week (Id.). Mettey insists that AFMI knew she spent an average of

-4-

sixty-five hours a week selling and servicing policies of AFMI
(Id.).    Additionally, Mettey asserts that AFMI required her to
lease certain computer equipment belonging to AFMI at a cost of
$139.00 a month (Id.).    Consequently, Mettey accessed AFMI's
computer system through her office computer and stored her client
information on this office computer as well as in AFMI's own
computer system (Id.).    Furthermore, Mettey alleges that she was
required to pay a portion of AFMI's southern Ohio advertising
budget and to share in the costs of telemarketing services (Id.).
These expenses as well as other office expenses exceeded $24,000.00
a year (Id.).

On January 8, 2001 AFMI informed Mettey that
her performance under the contract was not adequate (Id.).    Mettey
was informed that she needed to total forty-seven to fifty-one new
insurance applications per month and that she had to adopt certain
strategies to accomplish this quota such as installing a sign and
hiring a staff (Id.).    AFMI informed Mettey that failure to meet
the quota and perform these other requirements would result in the
cancellation of her contract.    Mettey avers that she was not aware
that AFMI had a policy of terminating Agent Agreements, for what
she contends are arbitrary reasons (Id.).    Furthermore, Mettey was
unaware that upon cancellation of the contract and without fair
compensation, AFMI appropriated an agent's client base, good will,
and right to payment for renewal premium commissions (Id.)

On May 10, 2001 Mettey was told by AFMI that she now had to achieve at least forty new applications per month and new business commissions of at least $1,500.00 per month (Id.). AFMI informed Mettey that failure to do so by August of 2001 would result in cancellation of her contract. On July 25, 2001 AFMI requested that Mettey resign (Id.). On July 26, 2001 Mettey was prevented by AFMI from entering AFMI's computer system from her own office computer (Id.). Additionally, on this same date, her contract was terminated by AFMI. On July 27, 2001, AFMI removed Mettey's computer, her business records, client lists, and agent manuals from her office (Id.). On August 1, 2001, Mettey requested a review of her termination in writing (Id.). Mettey maintains that there was a failure to review the termination as required by the Agent Agreement (Id.).

Mettey asserts that she received from AFMI, pursuant to the ACP, an amount initially equaling $2,500.00 per month less renewal premium commissions earned (Id.). On November 1, 2000, these payments were increased to $3,000.00 a month less renewal commissions earned (Id.). By August 1, 2001, Mettey insists that she owed AFMI no more than $63,500.00 for ACP payments (Id.). Mettey's compensation over a period of three and one quarter years, from AFMI, was the sum of new business commissions (equaling $24,335.00) and renewal commissions (equaling $36,100.00)

(<u>Id</u>.).  This compensation, argues Mettey, was less than the expense of operating her office (which was $79,700.00) (<u>Id</u>.).  The renewal commissions of $36,100.00 reduced the total advanced under the ACP to $63,500.00 (<u>Id</u>.).  This amount of $63,500.00 was a loan reportedly forgiven by AFMI on August 1, 2001 (<u>Id</u>.).

**METTEY'S ALLEGED CLAIMS**

### A.   Breach of Contract

Subsequently, Mettey alleges that AFMI breached the contract entered into on May 1, 1998 (<u>Id</u>.).  Mettey argues that the contract did not contain productivity terms or requirements - specifically, there was no requirement to obtain forty new insurance applications per month, or to earn new commissions of $1500.00 per month (<u>Id</u>.).  Mettey maintains she faithfully performed her obligations under the contract (<u>Id</u>.).  Mettey alleges that AFMI specifically breached the Agent Agreement at Section 4.k which specified that office expenses shall be incurred at the discretion of the agent (<u>Id</u>.).  Specifically, maintains Mettey, during the years 1999, 2000, and 2001, the Agent Agreement at Section 4 was repeatedly breached by AFMI requirements that Mettey lease an office, hire an employee, and install a sign (<u>Id</u>.).

Furthermore, Mettey maintains, that AFMI breached the Agent Agreement at Section 6.a which specified that she was an independent contractor for all purposes, with full control of her activities, and with the right to exercise

-7-

independent judgment as to time, place and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of the Agent Agreement (<u>Id</u>.). Additionally, this section was breached, according to Mettey, as AFMI required her to solicit applicants for new policies in a specific manner, at a specific time, and by requiring her to work a sixty-five hour work week (<u>Id</u>.).

Mettey also contends that AFMI breached the Agent Agreement at Section 7.a which specified that no modification of the Agent Agreement could be made unless the modification was agreed in writing by both Mettey and AFMI (<u>Id</u>.). Mettey maintains that AFMI modified the Agent Agreement without her consent during January and May 2001 by setting a production level of forty to fifty new insurance applications per month, by requiring the level of new business commissions to be at least $1,500.00 per month, and by requiring her to meet AFMI's business plan (<u>Id</u>.). Furthermore, Mettey affirms that AFMI breached Section 6.i of the Agent Agreement reserving to Mettey the right of review of any termination of the agreement, which AFMI did not permit (<u>Id</u>.).

In reliance upon the terms of the contract, Mettey avers that she expended moneys for advertising, a computer lease, an office lease, employee wages, utilities, and other items totaling in excess of $79,000.00 (<u>Id</u>.). Additionally, as a direct

result of her reliance on the contract terms, Mettey invested her time in the operation of the insurance office, on an average of sixty-five hours per week (Id.).  Mettey values this time in excess of $200,000.00 (Id.).

Also as a result of her reliance, Mettey was obligated to refrain from competing with AFMI's business for one year after the contract termination resulting in a loss of $51,000.00 (Id.).  Total losses alleged by Mettey as a result of her reliance and AFMI's breach is approximately $310,000.00 (Id.). Mettey contends that based upon promises made by AFMI, she expected to earn profits of $400,000.00 during her career as a sales agent for AFMI - these profits were not realized according to Mettey because of AFMI's breach (Id.).

Mettey argues that AFMI was enriched to the amount of $450,000.00 as a result of her performance under the contract (Id.).  Furthermore Mettey alleges that AFMI breached the covenant of good faith applicable in all contracts entered into under Wisconsin law (the Court notes that neither party disputes that Wisconsin law is controlling in this matter) by arbitrarily setting Mettey's production level during 2001 (Id.).  Due to this breach of the good faith covenant applicable in all Wisconsin contracts, Mettey argues that she is entitled to compensation for AFMI's enrichment by her performance and for damages for reliance upon the good faith covenant (Id.).

## B. Wages and Overtime Pursuant to the FLSA

Mettey affirms that this claim arose on August 1, 2001, upon AFMI's failure to compensate her (<u>Id</u>.). Mettey argues that AFMI are defined as "employers" pursuant to the FLSA and that she is defined as an "employee" pursuant to the same (<u>Id</u>.). Mettey maintains that all of the hours she spent in managing office employees, acting as a claims representative, underwriter, customer service representative, and collector as well as the hours spent servicing AFMI's insurance policies are "compensable activities" as considered by the FLSA (<u>Id</u>.). Mettey asserts that AFMI has refused to pay a minimum wage as required by the FLSA (<u>Id</u>.).

In total Mettey claims that AFMI owes her $28,584.00 in wages for hours worked in 1999, 2000, and 2001 (<u>Id</u>.). Additionally, Mettey maintains that AFMI owes her $26,839.00 for overtime hours worked during the same time period (<u>Id</u>.). Pursuant to 29 U.S.C. § 216(b) for willful violation of 29 U.S.C. § 206, Mettey claims AFMI is liable for minimum wages and liquidated damages equaling $57,168.00 and for willful violation of 29 U.S.C. § 207, Mettey maintains AFMI is liable for overtime compensation and liquidated damages totaling $58,500.00 plus reasonable attorney fees and costs.

AFMI's defenses to Mettey claims and the Court's Analysis regarding said claims and defenses are detailed

-10-

below.

**APPLICABLE LEGAL STANDARD**

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. Id. at 321; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Guarino, 980 F.2d at 405.

As the Supreme Court stated in Celotex, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405. Although the burden might not require the non-moving

-11-

party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.'" <u>Guarino</u>, 980 F.2d at 405 (quoting <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

**ANALYSIS**

### A.  AFMI's Arguments Re Mettey's Breach of Contract Claim & Mettey's Responses Thereto

AFMI asserts that Mettey's breach of contract claim must fail (doc. 28). AFMI notes that Mettey claims that the Agent Agreement, ACP, and Agent Manuals did not contain any productivity terms and that she "fully and faithfully performed the contract" (<u>Id</u>.). AFMI maintains that in sharp contrast to Mettey's claims, the contract specifically contemplated that production standards would be set (<u>Id</u>.). Specifically, AFMI cites Section 4.h

-12-

of the Agent Agreement, which required that the agent "meet the Company's production, profitability, and service requirements" (<u>Id</u>.). AFMI argues that since the Agent Agreement is silent with respect to the specificity of said requirements that it must be assumed that AFMI could set and alter the requirements as it saw fit (<u>Id</u>.). As Mettey could not meet the requirements set by AFMI, AFMI contends it was justified in terminating the contract (<u>Id</u>.).

As to Mettey's claim that AFMI breached Section 4.k of the Agent Agreement by requiring her to lease an office, hire an employee, and install a sign, AFMI responds that it did not require any of these things (<u>Id</u>.). AFMI maintains that Mettey decided to rent an office (<u>Id</u>.). It maintains that Mettey decided to hire or not hire employees (<u>Id</u>.). AFMI avers that it only suggested that Mettey acquire a sign and that it did not, in any way, assist Mettey with procuring or operating an office (<u>Id</u>.).

AFMI rejects Mettey's assertion that she was actually an employee of AFMI not an independent contractor (<u>Id</u>.). The portion of the contract which indicated Mettey would be working as an independent contractor read as follows:

It is mutually agreed that:

It is the intent of the parties hereto that you are not an employee of the Company for any purposes, but are an independent contractor for all purposes, including federal taxation with full control of your activities and the right to exercise independent judgment as to time, place and manner of soliciting insurance, servicing policyholders and

-13-

> otherwise carrying out the provisions of this
> agreement. As an independent contractor you
> are responsible for your self-employment taxes
> and are not eligible for various employee
> benefits such as Workers and Unemployment
> compensation.

(Id.). Mettey, notes AFMI, makes this assertion because she insists that AFMI required her to solicit applications for new insurance policies in a specific manner and time and required her to work sixty-five hours per week (Id.). These allegations AFMI flatly denies (Id.). AFMI argues that it could not have breached the contract by requiring Mettey to sell its products because that contract, obviously, was entered into for the primary purpose of selling AFMI products (Id.). AFMI disputes Mettey's claim that she was required to sell policies in a specific manner and at specific times (Id.). It claims that Mettey was free to sell policies however and whenever she pleased, so long as she was actually productive (Id.).

AFMI denies that it breached Section 7.a of the Agent Agreement which specified that no modification could be made to the Agreement without the written consent of both parties (Id.). Mettey, as noted above, claims AFMI modified the Agent Agreement unilaterally in January and May 2001 by setting new production levels pertaining to new applications and new business commissions and by requiring her to meet AFMI's performance business plan (Id.). AFMI argues that the contract specifically contemplated

-14-

that Mettey would have to meet a production requirement (<u>Id</u>.).
Section 4.h required that the agent "meet the Company's production,
profitability and service requirement."    AFMI admits that no
production numbers are set forth in the Agreement, but maintains
that both parties anticipated changes in these requirements from
time to time (<u>Id</u>.).  Regardless, avers AFMI, Mettey, herself, set
her production goals in early 2001, not AFMI (<u>Id</u>.).

     AFMI also denies breaching Section 6.i of the Agent
Agreement (<u>Id</u>.).  Mettey asserts that AFMI did not allow her a
right to review the termination of the contract (<u>Id</u>.).  However,
AFMI points out that the language of the Agent Agreement states:
"[i]n the event the Company terminates this Agreement, you may
request a review in accordance with the Termination Review
Procedure then in effect" (<u>Id</u>.).  The Termination Review Procecure
in place at the time provided:

> An American Family agent may request a review of the
> notice of termination by the office of the Vice President
> of Marketing.  The review request must be in writing and
> mailed within five days after receipt of  the
> written notice of termination.  A copy of the
> request is to be sent to the appropriate Regional
> Vice President.

(<u>Id</u>.).  Thus, argues AFMI, Mettey did not have an automatic right
of review of any termination (<u>Id</u>.).  Rather she had to request a
review in writing within five days of receipt of her notice of
termination (<u>Id</u>.).  This, AFMI maintains, Mettey failed to do
(<u>Id</u>.).  Despite Mettey's failure to request a review, AFMI asserts
that it did in fact review the termination with Mettey and even

offered her agency back, which Mettey refused (<u>Id</u>.).

AFMI maintains that Mettey's client list, files, future premiums, and policies were not her property but, rather, the property of AFMI (<u>Id</u>.). AFMI notes that Section 6.k of the Agent Agreement required Mettey to return to AFMI upon her termination "all policies and policy records, manuals, materials, advertising and supplies or other property for which [she] was a bailee" (<u>Id</u>.). Thus concludes AFMI, Mettey knew from the beginning that these items were not her property, but in fact the property of AFMI (<u>Id</u>.). Her right to possess these items, maintains AFMI, was only so long as she was an agent of AFMI (<u>Id</u>.). AFMI notes that Mettey admitted in her deposition that her client base, customer files, and goodwill were the property of AFMI (<u>Id</u>.).

Lastly, AFMI contends it did not break the implied covenant of good faith found in every Wisconsin contract (<u>Id</u>.). Wisconsin law, as aptly noted by both AFMI and Mettey, implies a contractual covenant of good faith in all contracts even if the terms of the written agreement have been fulfilled. <u>See e.g.</u>, <u>Estate of Chayka</u>, 176 N.W.2d 561 (Wis. 1970); <u>Foseid v. State Bank of Cross Plains</u>, 541 N.W.2d 203 (Wis. Ct. App. 1995); <u>Wisconsin Natural Gas Co. v. Gabe's Constr. Co.</u>, 582 N.W.2d 118 (Wis. Ct. App. 1998). AFMI notes that "good faith" is often defined in the negative, that is, an absence of "bad faith" (<u>Id</u>. <u>citing</u> <u>Foseid</u> at 213).

The <u>Foseid</u> court cites the Restatement (Second) of Contracts § 205, cmt. A, which provides that the concept of good faith "excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness." <u>Foseid</u> at 213. <u>Foseid</u> continues by citing the Restatement:

> Subterfuge and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in other party's performance.

<u>Id</u> (<u>internal</u> <u>citations</u> <u>omitted</u>). Additionally, AFMI cites <u>Chase Lumber & Fule Co. v. Chase</u>, 596 N.W.2d 840 (Wis. Ct. App. 1999), which held that the covenant of good faith is breached in a Wisconsin contract where the party to the contract acts in an "arbitrary and unreasonable" manner. <u>Chase Lumber</u> at 846.

AFMI clarifies further the law in Wisconsin as regards the covenant of good faith implicit in all contracts (doc. 28). AFMI notes that Wisconsin courts have been reluctant to find a breach of the good faith covenant where the contracting party complains of acts of the other that are specifically authorized by the contract (<u>Id</u>. <u>citing</u> <u>M & I Marshal & Isley Bank v. Schlueter</u>,

-17-

655 N.W.2d 521, 525 (Wis. Ct. App. 2002).  Lastly, AFMI states that most importantly the implied covenant of good faith cannot override a contract's express terms (Id. citing Gabe's Constr. at 122.

        AFMI disputes the items Mettey alleges evidence a lack of good faith including: (1) that her production level prior to January 1, 2001 was at or above the median of all agents in her district; (2) the arbitrary setting of her production level during 2001; and (3) the termination of her contract (Id.).  AFMI contends that Mettey cannot complain that her production level was arbitrary since she is the one who set her 2001 production level (Id.). Furthermore, AFMI maintains that its decision to terminate its contract with Mettey was based upon her "dismal" performance in the first half of January 2001 and that her "a little above average" performance prior to January 2001 was irrelevant to its decision to terminate (Id.).  AFMI argues that Mettey's low production was a valid reason to terminate the contract - a reason permitted under the contract and, thus, cannot constitute bad faith (Id.).  In conclusion, AFMI argues that Mettey's claim for breach of contract must fail in respects.

        The Court is certain that some of Mettey's assertions as to why/how AFMI breached the contract are speculative at best.  The Court particularly finds Mettey's argument that AFMI did not permit her a chance to review her termination and her argument that AFMI did not have a right to retain her records,

-18-

goodwill, client base, and future premiums insubstantial. The language of the contract dilutes severely these arguments of Mettey. However, the Court does find that issues of material fact exist as to other of Mettey's arguments which are sufficient to withstand AFMI's Motion for Summary Judgment. The Court specifically finds Mettey's claim that she was treated as an employee rather than an independent contractor and her claim that AFMI violated the covenant of good faith and fair dealing inherent in all Wisconsin contracts as issues that should be presented to the trier of fact. As such, Mettey's claim for breach of contract survives AFMI's Motion for Summary Judgment. These two issues are discussed in greater detail below.

Mettey does not dispute the law regarding the covenant of good faith implicit in all Wisconsin contracts as cited by AFMI (doc. 39). Again, factual disputes are paramount to this claim. Mettey argues that the good faith covenant was breached by the expectation letter dated May 14, 1998 in that the letter was a subterfuge because it did not fully disclose the risks and need for large monetary expenditures and time investments required to sell insurance for AFMI (Id.). Furthermore, Mettey maintains that AFMI set productivity and profitability requirements at levels they knew were unattainable by new agents working in a new market (Id.). Mettey notes that Ken Toureen (employee of AFMI who initially met

with Mettey in 1998) admitted in deposition that no uniform
standards of production were used to judge an agent's performance
and that the levels set were arbitrary, and levels met by only five
percent of AFMI's agents (Id.).    Additionally, good faith was
breached, argues Mettey, by AFMI requiring her to perform so many
non-sale functions, beyond the obligations set forth in the Agent
Agreement (Id.).

Clearly, material facts are in dispute as to whether
the covenant of good faith and fair dealing inherent in all
Wisconsin contracts was breached.    A trier of fact could find
subterfuge on the part of AFMI, evasions, and/or abuse of power as
to its ability to specify all the terms.    The Court is not weighing
the evidence supporting either parties' arguments.    It is simply
recognizing that a trier of fact is in the best position to resolve
this dispute.

Second, Mettey counters AFMI's arguments regarding
the independent contractor/employee issue by noting that Toureen
acknowledged in deposition that district managers and sales
directors of AFMI were unaware of any definition of "independent
contractor" or any guidelines differentiating an employee from an
independent contractor (doc. 39).    Under Wisconsin law an
independent contractor is defined as

> [O]ne who is employed to do a piece of work without
> restriction as to the means to be employed, and who
> employs his own labor and undertakes to do the work
> in accordance with his own ideas or under plans

furnished by the person for whom the work is done,
to produce certain results required by such person
. . .

Saunders v. DEC Intern, Inc., 270 N.W.2d 176, 179 (Wis. 1978).

Saunders also states that "independent contractors are not
controlled as to their physical conduct by the persons who hire
them." Id. Furthermore, the Wisconsin Supreme Court has noted
that "[t]he most important single indicium [of whether one is an
independent contractor] is who has retained the right to control
the details of the work [the independent contractor or the
employer]." Mueller v. Luther, 142 N.W.2d 848, 851 (Wis. 1966).

Mettey asserts that numerous facts point to the
physical control that AFMI maintained over her (doc. 39). For
example, an email sent to Mettey by AFMI, indicated that certain
training classes "are not elective . . . [and] must take first
priority on your planner. This block of time should be set aside
and nothing should interfere with your attendance for the entire
session" (Id.). Furthermore, a marketing plan (i.e., "the 232
Marketing Plan") that Mettey asserts she was required to follow had
specific tasks to do each day Monday through Sunday (Id.). Mettey
also highlights the district manager meetings agendas of from 2001
as well as her own testimony evidencing that AFMI required cold
calls in the evenings and on Saturday mornings (Id.). Mettey also
avers that AFMI required her to enroll in pay program for leads, to
attend special events, and to only use two methods for premium

payment (Id.).    Mettey additionally, referencing Toureen's
deposition, notes that weekly reports were required (Id.).

Mettey particularizes multiple other facts in her
Response to AFMI's Motion for Summary Judgment indicating how she
was treated as an employee and not an independent contractor.
Given the conflicting interpretations of circumstances by AFMI and
Mettey, the Court is not in a position to grant AFMI's Motion for
Summary Judgment as it pertains to Mettey's claim that her contract
was breached because AFMI treated her as an employee and not as an
independent contractor.  This is an issue best left to the trier of
fact.   Both sides cite testimony in various depositions that
support their arguments - it is not the Court's province to
determine the truth of one or the other's assertions.   Material
facts being in dispute, AFMI's Motion for Summary Judgment as to
the breach of contract claim must fail.

### B.  AFMI's Arguments Re Mettey's FLSA Claim

AFMI maintains that Mettey's claim that she is due
regular as well as overtime wages pursuant to the FLSA is
absolutely unsupported by Mettey's own testimony and other evidence
(Id.).  First, AFMI notes, that in order for Mettey's FLSA claim to
succeed, she must have been an employee of AFMI not an independent
contractor as suggested by the terms of the contract (Id.).  Again,
AFMI highlights the language of the contract indicating that Mettey
was an independent contractor (Id.).  AFMI points to the deposition

of one Deb Harp (hereinafter "Harp") who was similarly situated to Mettey (i.e., a new agent in the new Ohio South District) to support the proposition that agents of AFMI were indeed independent contractors (Id.).

The Sixth Circuit has articulated six factors to determine whether the relationship at issue is one of employment or one of an independent contractor. See e.g., Donavan v. Brandel, 736 F.2d 1114 (6th Cir. 1984). These six factors are:

> (1) the permanency of the relationship between the parties;
>
> (2) the degree of skill required for rendering of the services;
>
> (3) the worker's investment in equipment or materials for the task;
>
> (4) the worker's opportunity for profit or loss, depending upon his skill;
>
> (5) the degree of the alleged employer's right to control the manner in which the work is performed; and
>
> (6) whether the service rendered is an integral part of the alleged employer's business.

Id. at 1117. The Sixth Circuit also adopted the "economic realties" test enunciated in Goldberg v. Whitaker House Coop., 366 U.S. 28, 33 (1961), noting:

> Put another way, the multi-factor "economic
> realities" test "looks to whether the putative
> employee is economically dependent upon the
> principal or is instead in business for himself.
> This test is a loose formulation, leaving the
> determination of employment status to a case-by-
> case resolution based on that totality of the
> circumstances.

Brandel at 1116 (internal citations omitted).

AFMI asserts that summary judgment is appropriate in determining whether someone is an employee or independent contractor for FLSA purposes, because this is a question of law (doc. 28 citing Fegley v. Higgins, 19 F.3d 1126, 1132 (6th Cir. 1992). However, the Court notes that a subsequent Sixth Circuit opinion has held that where material facts are in dispute, especially given the need to balance the six factors listed above, the trier of fact plays a "principal part" and summary judgment is not always appropriate. See Imars v. Contractors Mfg. Servs. Inc., 165 F.3d 27, 1998 WL 598778 at *3 (6th Cir. Aug. 24, 1998) (unpublished). The relevance of Imars will be explored further by the Court later in its analysis.

AFMI naturally argues that balancing the six factors enumerated above results in a finding that no issue of material facts exists as to whether Mettey was an independent contractor (doc. 28). AFMI addresses each factor in its Motion for Summary Judgment. The Court will summarize AFMI's arguments for each factor below.

(1) **Permanency of the Relationship:** AFMI points to the fact that either party could terminate the contract at any time, as evidenced by Section 6.h of the Agent Agreement (<u>Id</u>.). AFMI notes there was no fixed term and no minimum amount of time that Mettey or any other agent had to spend as an independent contractor.

(2) **Degree of Skill:** AFMI states that Mettey in her deposition admitted she came to AFMI with a fair amount of skill as an independent contractor (<u>Id</u>.). Further, notes AFMI, Mettey earned her license from the State of Ohio to sell insurance (<u>Id</u>.). AFMI does admit that it provided training to Mettey on its policies and procedures (<u>Id</u>.).

(3) **Worker's Investment in Equipment or Materials for the Task:** Although AFMI offered to Mettey the ACP (providing from most accounts at least $2500.00 a month to Mettey), AFMI argues that this money was provided to Mettey to use as she saw fit (<u>Id</u>.). Mettey chose to spend her ACP stipend on an office and advertising materials (<u>Id</u>.). AFMI notes that Mettey had her own bank account, rented her own office space and office supplies (such as phone and computer) (<u>Id</u>.).

(4) **Worker's Opportunity for Profit or Loss:** AFMI simply remarks that profits or lack thereof were entirely within Mettey's control (<u>Id</u>.). Clearly, the more products sold by Mettey the larger her profit margin <u>Id</u>.). Thus, her ability for profit or loss, asserts

AFMI, was completely within her own hands (Id.).

(5) **Degree of Right to Control by Alleged Employer:** AFMI suggests this factor weighs in their favor as current agents of AFMI readily admit they are independent contractors not employees of AFMI (Id.). The training and programs offered by AFMI were to benefit Mettey not to control her (Id.). Mettey's claims that she was forced to adhere to a time management and marketing plan are, according to AFMI, not true (Id.). AFMI asserts that Mettey is the only person who maintains that AFMI dictated how she should manage her time (Id.). AFMI avers that it provided ideas to Mettey on how to conduct her business but ultimately Mettey was allowed to conduct her business the way she felt appropriate (Id.). AFMI maintains that Mettey was not required to work a set number of hours per week nor was she required to attend events or submit daily reports (Id.).

(6) **Whether Service Rendered is an Integral Part of Business:** AFMI admits that Mettey was in business to sell AFMI insurance products which is also exactly what AFMI is in business to do (Id.).

Clearly, many of Mettey's arguments and evidence referenced in support of her breach of contract claim regarding the independent contractor/employee issue are equally applicable with regards to her FLSA claim. As mentioned earlier, the Sixth Circuit's opinion in Imars is extremely useful in guiding the Court

to reach a just and correct determination regarding Mettey's FLSA claim. Additionally language from _Imars_ will be quoted. In considering the "economic realities" test, _Imars_ notes "[the] test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances." _Imar_ at *3 _quoting_ _Lilley v. BTM Corp._, 958 F.2d 746, 750 (6th Cir. 1992).

Discussing a Fifth Circuit case, _Imars_ holds that "crediting either the intentions of the parties or the explicit contractual relationships in determining employee status in FLSA cases" should be rejected. _Id_. at *4 _citing_ _Robicheaux v. Radcliff Mat'l_, 697 F.2d 662 (5th Cir. 1983). _Robicheaux_, notes _Imars_, utilizes the five (or in the Sixth Circuit's jurisprudence six factor) test, "but reduce[s] it to the question of dependence on the employer, asking if, as a matter of economic reality, the worker is 'in business for himself.'" _Imars_ at *4 (_internal citations omitted_). Ultimately _Imars_ holds "that it makes very good sense to reject contractual intention as a dispositive consideration in our analysis. The reason is simple: "'The FLSA is designed to defeat rather than implement contractual arrangements.'" _Id_. _quoting_ _Secretary of Labor v. Lauritzen_, 835 F.2d 1529, 1544-45 (7th Cir. 1987). Even when the bargaining is conducted at arm's length, this remains true. _Id_. Lastly, _Imars_ in conducting its analysis looked at the factors in _Brandel_, but

-27-

noted "we are cognizant of the fact that few of these factors
necessarily makes economic sense, and all of the factors are far
too easy to manipulate and mold . . . to . . . [fit]  a
preconceived result."  Id. citing Lauritzen at 1539-43.

        The Court will now turn to the Brandel factors.  In
Imars, the Sixth Circuit found that plaintiff's two year
relationship with the defendant and the fact that he worked over
forty hours a week, caused the "permanency" factor to weigh in the
plaintiff's favor.  Imars at *6.  Here, Mettey had approximately a
three year relationship with AFMI and Mettey contends that she
worked well in excess of forty hours per week.  As such, permanency
in the instant matter weighs in Mettey's favor.

        As to the skill factor, Imars found that the
plaintiff "took little direction and was substantially more skilled
than other workers . . . [and he] was . . . granted substantial
autonomy to figure out what he thought was the best way to complete
his assignments."  Id.  In the instant matter, Mettey provides
evidence that she was substantially less skilled than experienced
agents working in established markets.  Furthermore, Mettey points
to a number of facts that establish she was not provided autonomy
to complete her tasks, but rather was instructed on when and how to
do her job.  Of course, these facts are disputed by AFMI.
Regardless, the skill factor tends to weigh in Mettey's favor.

        The investment factor, as in Imar, appears to "cut

both ways." Id. Mettey contributed her own time and some of her own money. However, AFMI provided Mettey with approximately $2500.00 of its money to fund her agency.

Opportunity for profit or loss on skill supports an inference of independent contractor status. Mettey's success was presumably wholly dependent upon the number of new policies generated and premiums collected. Despite Mettey's arguments that AFMI prevented her from effectively pursuing new policies because she was required to perform other duties, does not persuade the Court to weigh this factor in her favor.

Control of the manner in which work is performed is not an easy call. Mettey argues, and provides evidence, that AFMI was overly controlling in the manner in which she performed her work. AFMI disputes these allegations. Given the weight of the evidence presented by the parties concerning this matter, the Court finds that this factor too weighs in Mettey's favor.

Imars did not address the sixth factor enunciated in Brandel. Id. However, clearly Mettey's service - that of selling AFMI's insurance products - was an integral part of the employer's business. AFMI readily admits so in its Motion for Summary Judgment. As such, the Court finds that this factor also weighs in Mettey's favor.

The factors that weigh in Mettey's favor equal

-29-

four.  The Court counts two weighing in AFMI's favor.  However, as noted above, this case is one that turns on the facts and ultimately the trier of fact's conclusions regarding those facts.  As such, the Court is willing to concede that any of the factors could ultimately be found to weigh in the other's favor.  Having weighed all of these factors, as in <u>Imars</u>, the Court finds that where the factors "are in equipose" summary judgment is not appropriate.

**CONCLUSION**

The Court hereby DENIES the Defendants' Motion for Summary Judgment (doc. 28).  Furthermore, the Court SCHEDULES a Final Pre-Trial Conference in this matter for May 3, 2005 at 2:00 P.M. and SETS a three-day jury trial to begin at 9:30 A.M. on June 7, 2005 on an on-deck basis.


SO ORDERED.


Dated: March 18, 2005            s/S. Arthur Spiegel
                                 S. Arthur Spiegel
                                 United States Senior District Judge